

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00203-CV

IN THE INTEREST OF S.T., A
CHILD

----------

## FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 323-99427J-13

----------

## OPINION

----------

## I. Introduction

In a single issue, Appellant Father appeals the trial court's determination that the Department of Family and Protective Services (DFPS) should remain his child S.T.'s managing conservator. We reverse the trial court's judgment and remand the case for a new trial.

## II. Factual and Procedural Background

DFPS filed a petition for protection, conservatorship, and termination of parental rights a few days after S.T.'s birth in November 2013.[1] Not quite a year later, when DFPS notified Father that he might be S.T.'s father, he immediately wrote back, requested a DNA test, and stated that he would parole within five months.[2] The trial court extended the suit's dismissal date and ordered a paternity test. The test results confirming Father's paternity were filed on December 29, 2014.

In January 2015, in his CPS service plan, Father was assigned parenting classes, a substance abuse assessment, random drug tests, and individual counseling, and he was required to refrain from criminal activities, illegal acts, and illegal drugs and to maintain safe, stable, and appropriate housing.[3] In April 2015, Father filed an original answer in the case, requesting appointment as the child's permanent managing conservator or, alternatively, appointment of DFPS

---

[1]S.T. tested positive for cocaine at birth; she was removed from her mother because her mother had been using crack cocaine, alcohol, and marijuana while pregnant with the child. As of mid-May 2014, S.T.'s father was listed as "unknown father." In June 2014, when S.T.'s mother revealed Father's identity as the child's father, she told her Child Protective Services (CPS) caseworker that Father was in jail for supplying drugs to her. Father denied having ever given drugs to S.T.'s mother.

[2]Father had been incarcerated in a Texas Department of Criminal Justice facility for heroin possession. He made parole in January 2015, and the case was continued to give him an opportunity to work his CPS service plan.

[3]Father had complied with almost all of his service plan requirements by May 2015.

as the child's permanent managing conservator and his appointment as the child's possessory conservator.

DFPS filed a motion seeking to be named the child's permanent managing conservator and for S.T.'s maternal grandmother P.T. to be named the child's temporary possessory conservator.[4] At the conclusion of the hearing on DFPS's motion, DFPS asked the trial court to make DFPS S.T.'s permanent managing conservator, make P.T. the child's possessory conservator, and adjudicate Father as S.T.'s father.[5] The trial court adjudicated Father as the child's father, named DFPS as S.T.'s managing conservator, and named P.T. as the child's temporary possessory conservator.[6]

### III. Discussion

Father argues that the evidence is legally and factually insufficient to support the trial court's finding that appointing him as S.T.'s sole managing conservator or a joint managing conservator would significantly impair the child's physical health or emotional development. He complains that the trial court

---

[4]S.T.'s foster parents filed a petition in intervention, seeking to become the child's sole managing conservators and seeking termination of both parents' rights to the child.

[5]S.T.'s mother and S.T.'s ad litem attorney both agreed with DFPS's plan for the child.

[6]The trial court dismissed DFPS's petition to terminate parental rights and the intervenors' claims.

abused its discretion because the evidence is insufficient to overcome the parental presumption in family code section 153.131(a).

DFPS responds that Father invited the error he now complains of when he requested the relief the trial court granted, even though he requested this relief in the alternative, and that the evidence is legally and factually sufficient to support the trial court's order.

## A. Invited Error

Under the doctrine of invited error, a party is estopped from challenging a trial court's ruling on appeal if the complaining party actually requested the specific action that the trial court took. *Everitt v. Everitt*, No. 01-11-00031-CV, 2012 WL 3776343, at *10 (Tex. App.—Houston [1st Dist.] Aug. 31, 2012, no pet.) (mem. op.) (citing *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861–62 (Tex. 2005)). This rule bars a party from convincing a trial court to take a particular action and then convincing an appellate court that the trial court's action was erroneous—that is, it prevents an appellant from having his cake and eating it too.

Whether in this case Father is estopped from challenging the trial court's decision depends upon what Father requested the trial court to do, how clearly he articulated his request, and whether the trial court ultimately granted the relief requested.

In his pleadings, Father requested two alternative forms of relief:

4

> . . . that [S.T.] be returned to [Father] and [Father] be named Permanent Managing Conservator of [S.T.].  Or, in the alternative, [Father] prays that [Father]'s parental rights are not terminated and the Department of Family and Protective Services be named Permanent Managing Conservator and [Father] be named Possessory Conservator over [S.T.].

The trial court did not grant either of these alternatives; therefore, based upon the pleadings, the invited error doctrine would not preclude Father from challenging the trial court's ruling on appeal.  *In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) (orig. proceeding) (holding that the invited error rule did not apply when "[appellant] does not assert error in regard to what she asked the trial court to do and it *did* do . . . [s]he asserts error in regard to what she asked the trial court to do and it *did not* do").

However, at the permanency hearing three weeks later, Father's request for alternative relief changed.  During opening statements, Father's attorney stated his position as, "I believe today the father will be asking for custody of the child, possession of the child, or, in the alternative, possession of the child going to maternal grandparents."  And Father testified consistent with his attorney's opening statement:

> Q.  Are you okay with if [sic] the Court desires for CPS to remain in the case and monitor your placement with [S.T.] – or [S.T.]'s placement with you?
>
> A.  Yes.
>
> . . . .

Q. If this Court does not feel at this time you're ready for placement for [S.T.] to be placed with you, are you asking the Court to place with [P.T.]?

A. Yes.

Thus, at this juncture during trial, the record shows that Father requested that the trial court either: (1) place S.T. with him on a DFPS-monitored basis, or (2) place the child with her grandmother.

However, during final argument, Father's attorney equivocated, summarizing Father's position as:

. . . . *And we are today asking you to return the child to [Father].* If the Court doesn't feel comfortable returning, you know, bam, PMC, we're out of here. And I understand that, and I think [Father] understands that.

He testified that he would understand -- *he would understand about having a monitored return is what the Department would say and allow the Department to monitor that.* He hasn't had that opportunity . . . .

. . . Screw it up if he has to, but at least prove to the Court that he can do it or cannot do it. *And if this Court doesn't think that he's -- he needs to have the opportunity to do that, then we do ask that you place with [P.T.], either on a PMC basis or the Department PMC*, and to allow [Father] to finish his individual counseling, however much is left of that. But I believe that he at least needs that opportunity to do that.

. . . He's done everything he needed to do, with the exception of finishing those individual counseling. *So I ask this Court to return the child to him, give him the opportunity. If the Court doesn't like that, then to give to [P.T.].* If the Court gives the [foster parents] to provide some kind of guideline for them to allow this child to visit with the parents and blood-related siblings. [Emphasis added.]

6

At the outset of final argument, Father's attorney urged the trial court to appoint him permanent managing conservator of S.T., but barring that, to provide a DFPS-monitored placement with him. Just minutes later in the argument, Father's attorney modified Father's position somewhat, requesting that the court: (1) place S.T. with him, or alternatively, (2) place S.T. with grandmother as permanent managing conservator, or (3) place S.T. with DFPS as permanent managing conservator. A few minutes later, Father's attorney concluded his argument by seeking yet a different outcome: (1) placement of S.T. with Father, or (2) placement of S.T. with her grandmother.[7] In its May 29, 2015 order, the trial court appointed DFPS as permanent managing conservator of S.T. with P.T. as S.T.'s temporary possessory conservator, and ordered that Father have reasonable visitation and access to S.T. "as agreed upon, arranged by, and supervised by DFPS or any responsible adult approved by DFPS."

The concept of invited error in Texas jurisprudence is said to be "grounded in even justice and dictated by common sense." *Neasbitt v. Warren*, 22 S.W.3d 107, 112 (Tex. App.—Fort Worth 2000, no pet.) (citing *Ne. Tex. Motor Lines, Inc. v. Hodges*, 158 S.W.2d 487, 487–88 (Tex. 1942)). This rule, which finds its roots in equity and is a form of estoppel, bars a party from encouraging a court to take a specific action and then complaining on appeal that the trial court erred by

___

[7]Father's attorney also added that if the court placed the child with the foster parents, that guidelines be established for his visitation with S.T. The court did not place S.T. with the foster parents.

taking it. *Dep't of Family & Protective Servs.*, 273 S.W.3d at 646 (citing *Tittizer*, 171 S.W.3d at 862); *see also Tittizer*, 171 S.W.3d at 862 ("[A] party cannot complain on appeal that the trial court took a specific action that the complaining party requested . . . ."); *Dalworth Restoration, Inc. v. Rife-Marshall*, 433 S.W.3d 773, 787 (Tex. App.—Fort Worth 2014, pet. dism'd w.o.j.) ("The invited error doctrine prevents a party from asking for relief from the trial court and later complaining on appeal that the trial court gave it."); *Garcia v. Garza*, 311 S.W.3d 28, 38 (Tex. App.—San Antonio 2010, pet. denied) (op. on reh'g) (citing *Doucet v. Owens-Corning Fiberglas Corp.*, 966 S.W.2d 161, 165 (Tex. App.—Beaumont 1998, pet. denied), *cert. denied*, 526 U.S. 1131 (1999)).

How the invited-error doctrine applies to circumstances such as these, where relief is requested in several differing alternatives, appears to be an issue of first impression in Texas. In support of its argument that the doctrine applies even when relief is requested in the alternative, DFPS refers us to five cases: *Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533, 1540 (11th Cir. 1993);[8] *Bradley v. State*, 2009 Ark. App. 714, at 10, 370 S.W.3d 263, 270 (Ark.

---

[8]In *Georgetown Manor*, a tortious-interference-with-business-relationship case, the parties agreed to provide the jury with three alternatives for interest calculation, including one calculated with simple interest. 991 F.2d at 1535, 1540. The court held that the appellant could not complain on appeal that the jury elected one of those alternatives, based on the doctrine of invited error. *Id.* at 1540.

8

Ct. App. 2009);[9] *Rye v. State*, 2009 Ark. App. 839, at 12, 373 S.W.3d 354, 361

(Ark. Ct. App. 2009);[10] *Junior v. Dezao*, No. FM-14-1579-08, 2014 WL 145312, at

*5 (N.J. Super. App. Div. Jan. 16, 2014) (not designated for publication);[11] *In re*

*Marriage of Shoepske*, No. 12-2210, 2013 WL 4010286, at *7 (Iowa Ct. App.

Aug. 7, 2013) (not designated for publication).[12] None of the five cases are from

---

[9]*Bradley*, a murder and battery case, involved an appellate challenge to an agreement between the parties made in open court. 2009 Ark. App. 714, at 1, 370 S.W.3d at 266. The defendant asked the trial court for the identity of an informant or alternatively, that the email containing the informant's exculpatory hearsay information be admitted. *Id.* at 9, 370 S.W.3d at 269–70. The trial court accepted the email into evidence, and the defendant raised no further complaints about the informant's identity until the appeal. *Id.* at 9–10, 370 S.W.3d at 270. The appellate court concluded that the defendant had invited the error. *Id.* at 10–11, 370 S.W.3d at 270.

[10]In *Rye*, a sexual assault case in which the appellant challenged a stipulation she had made in the trial court as to the unavailability of a witness, the appellate court held that the appellant could not both request the trial court to accept the stipulation and claim to the appellate court that it was error for the trial court to have done so. 2009 Ark. App. 839, at 1, 3, 12, 373 S.W.3d at 355–56, 361.

[11]In *Junior*, an appeal of a property settlement agreement containing alimony two years after divorce, the trial court granted to the appellant the alternative relief he requested at trial; on appeal, he complained that the trial court had not made a finding necessary to support granting that relief. 2014 WL 145312, at *1, *5. The appellate court, without discussion, concluded that the appellant's contention lacked sufficient merit to warrant discussion, dismissing the issue by stating, "It suffices to say that any error was invited." *Id.* at *5.

[12]In *Schoepske*, a post-divorce appeal involving property division, the parties agreed at trial as to the appropriate alternative relief requested. 2013 WL 4010286, at *1, *6–7. The husband proposed three alternative methods for the trial court to employ to equalize the debt between the parties upon divorce, the wife agreed to the first method proposed, and the court applied the agreed-upon method in ordering the division of the marital estate. *Id.* at *3, *7. The appellate court pointed out that under Iowa law, if a party poses his requests for relief in

9

Texas courts, and none purport to apply Texas law. Further, none of the facts in those five cases bear any resemblance to the facts of this one.[13]

Assuming, without deciding, that the invited error doctrine would preclude an appellant who sought relief in the alternative from complaining on appeal when the trial court wholly accepted one of the alternatives, it is clear in Texas law that for a party to be estopped from asserting a position in an appellate court based on actions it took in the trial court, the party must have "unequivocally taken a position in the trial court that is clearly adverse to its position on appeal." *Dep't of Family & Protective Servs.*, 273 S.W.3d at 646; *see Am. Sav. & Loan Ass'n v. Musick*, 531 S.W.2d 581, 589 (Tex. 1975) (holding that "[o]ne of the requirements for application of the doctrine of judicial estoppel is that the statement must be deliberate, clear, and unequivocal").

Here, it cannot be said that Father's position at trial was unequivocal. Rather, he equivocated at almost every turn. The relief he sought in his pleadings did not mirror his stated position in his opening statement; his request during closing arguments differed from both his pleadings and his testimony at

_____

the alternative, and the court accepts one of the alternatives, the court's ruling is not "adverse." *Id.* at *7. The appellate court also pointed out that a stipulation of settlement in a dissolution proceeding stands as a contract between the parties that becomes final when accepted by the court. *Id.*

[13]Of the five cases cited by DFPS, *Georgetown Manor* is arguably the closest factually to the case at issue. Yet even *Georgetown Manor* is distinguishable from this case because in that case, the appellant clearly articulated three separate and alternative methods *to give to a jury* to calculate damages, each of which would have resulted in a different figure. 991 F.2d at 1540.

10

trial. Indeed, given the ever-changing nature of his stated positions, it would have been a difficult task for the trial court in this case to have been guided at all by Father's expressed desires.

For the same reasons, it cannot be said that Father's requests for alternative relief were clear or that his position at trial was clearly adverse to his position on appeal. On one point in particular Father was steadfast—his primary desire was to be named permanent managing conservator of S.T.—and the trial court did not grant this relief to him. Based on the lack of clarity in Father's positions in the trial court as to all remaining alternatives suggested by him during the course of trial, we cannot say that his position on appeal is barred by the invited error doctrine.[14] Therefore, we decline the State's invitation to avoid reaching the merits of Father's sole issue.

---

[14]Nothing in the record suggests that Father's shifting positions were deliberate. *See Musick*, 531 S.W.2d at 589. Nor does it appear to be an attempt on Father's part to ambush the trial court, seed the record with error, encourage the court to take the very action he complains of on appeal, cause the error he complains of on appeal, or any other evil that this rule of equity is designed to combat. *See Wackenhut Corr. Corp. v. de la Rosa*, 305 S.W.3d 594, 624 (Tex. App.—Corpus Christi 2009, no pet.), *abrogated on other grounds by Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143 (Tex. 2015); *see also Dep't of Family & Protective Servs.*, 273 S.W.3d at 646; *In re Marriage of Palacios*, 358 S.W.3d 662, 664 (Tex. App.—Amarillo 2009, pet. denied) (op. on reh'g); *Garcia*, 311 S.W.3d at 38.

## B. Best Interest of the Child

### 1. Standard of Review and Applicable Law

The supreme court has distinguished the standard applicable to termination of parental rights from that of conservatorship appointments, stating that

> the quantum of proof required to support a termination decision differs from the level necessary to support a conservatorship appointment. Termination decisions must be supported by clear and convincing evidence. Due process compels this heightened standard because terminating the parent-child relationship imposes permanent, irrevocable consequences. On the other hand, a finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard. These differing proof standards, in turn, affect the method of appellate review, which is more stringent for termination decisions than for those regarding conservatorship. . . . Conservatorship determinations . . . are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable.

*In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (citations omitted).

In applying the abuse of discretion standard here, we must first determine whether the trial court had sufficient evidence upon which to exercise its discretion and then whether the trial court erred by applying its discretion. *In re M.C.F.*, 121 S.W.3d 891, 895 (Tex. App.—Fort Worth 2003, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28–29 (Tex. 2002); *Seidel v. Seidel*, 10 S.W.3d 365, 368 (Tex. App.—Dallas 1999, no pet.)). Under the abuse-of-discretion standard, legal and factual insufficiency are not independent grounds for asserting error,

but are merely relevant factors in assessing whether a trial court abused its discretion. *In re M.P.B.*, 257 S.W.3d 804, 811 (Tex. App.—Dallas 2008, no pet.). The evidentiary-sufficiency review is part of the first inquiry. *M.C.F.*, 121 S.W.3d at 895. After assessing the sufficiency of the evidence, we determine whether, based on the elicited evidence, the trial court made a reasonable decision. *In re B.P., Jr.*, No. 02-07-00251-CV, 2008 WL 2639264, at *2 (Tex. App.—Fort Worth July 3, 2008, no pet.) (mem. op.).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

13

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

A trial court abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But an abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

A court's primary consideration in determining the issue of conservatorship must always be the best interest of the child. Tex. Fam. Code Ann. § 153.002 (West 2014); *J.A.J.*, 243 S.W.3d at 614. Courts may use a nonexhaustive list of factors to determine the child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g). Those factors include

(A)     the desires of the child;

14

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley*, 544 S.W.2d at 371–72 (citations omitted).[15]

---

[15]Statutory factors to be considered in determining the best interest of the child with regard to the child's prompt and permanent placement in a safe environment include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by DFPS; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's

Further, as pointed out by Father, there is a rebuttable presumption that appointment of a parent as managing conservator is in the child's best interest. Tex. Fam. Code Ann. § 153.131 (West 2014). Section 153.131(a) provides,

Subject to the prohibition in Section 153.004,[16] *unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development*, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

*Id.* § 153.131(a) (emphasis added); *see In re V.L.K.*, 24 S.W.3d 338, 341–42 (Tex. 2000) (stating that under family code chapter 153, a nonparent can rebut

---

care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. Tex. Fam. Code Ann. § 263.307(b) (West Supp. 2015) (listing factors in determining best interest of child in review of placement of children under DFPS's care).

[16]Section 153.004 provides that in determining whether to appoint a party as a sole or joint managing conservator, the court shall consider evidence of the intentional use of abusive physical force or evidence of sexual abuse by a party directed against the party's spouse, a parent of the child, or any person younger than 18 years of age committed within a two year-period preceding the filing of the suit or during the pendency of the suit. Tex. Fam. Code Ann. § 153.004(a) (West 2014). Further, the statute requires that if credible evidence is presented of a history or pattern of past or present child neglect or abuse by one parent against the other, a spouse, or a child, the court may not appoint the parties as joint managing conservators and shall consider the commission of family violence or sexual abuse in determining whether to deny, restrict, or limit possession of the child by a parent who is appointed as a possessory conservator. *Id.* § 153.004(b)–(c).

16

the parental presumption by showing that appointment of the parent would significantly impair the child's health or development).[17]   The parental presumption in section 153.131 "is based upon the natural affection usually flowing between parent and child."  *V.L.K.*, 24 S.W.3d at 341.

The supreme court discussed the "significantly impair" standard in *Lewelling v. Lewelling*, and held that nonparents seeking custody must identify some act or omission committed by the parent that demonstrates that naming him as managing conservator will significantly impair the child's physical health or emotional development.  796 S.W.2d 164, 167–68 (Tex. 1990).  The court stated that the fact that a parent may be unemployed or live in crowded conditions is not enough to show significant impairment, nor are two visits to a mental health hospital when there is no showing of mental problems or evidence that the parent is a victim of spousal abuse.  *Id.* at 167 (holding evidence did not show significant impairment in custody battle between mother and paternal grandparents); *see also In re K.R.B.*, No. 02-10-00021-CV, 2010 WL 3928727, at *4 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem. op.) ("Impairment must be proved by a preponderance of the evidence indicating that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or

---

[17]A finding of a history of family violence involving the child's parents is another way to rebut the presumption, as is the parent's voluntary relinquishment of actual care, control, and possession of the child to a nonparent, licensed child-placing agency, or DFPS for a period of one year or more.  *See* Tex. Fam. Code Ann. §§ 153.131(b), .373 (West 2014).

17

omissions of the parent, will probably cause that harm."). In contrast, conduct from two or three years before plus other evidence of more recent conduct—failure to visit the child and inconsistent communication with the child—as well as evidence of the child's bond with his foster parents in a stable environment, in which he had been placed because of the parent's acts and omissions, constitutes some evidence to support finding significant impairment to the child's physical health or emotional development if the child were placed back in the parent's custody. *Danet v. Bhan*, 436 S.W.3d 793, 797–98 (Tex. 2014) (remanding case to consider factual sufficiency).

Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent. *K.R.B.*, 2010 WL 3928727, at *5. The material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness. *Id.* at *11 (holding that although mother's past criminal conduct and drug use were relevant, they did not demonstrate that appointing her managing conservator around twenty months later, after she had tested negative on multiple drug tests, would significantly impact the child's physical health or emotional development); *In re S.W.H.*, 72 S.W.3d 772, 778–79 (Tex. App.—Fort Worth 2002, no pet.) (stating that none of the evidence regarding appellant's actions more than four years ago showed that appointing her the child's managing conservator at present would significantly impair the child's physical health or emotional development when it was

18

uncontroverted that she had remained clean and sober since she entered drug treatment and there was uncontroverted evidence that she had maintained steady employment, had a safe and stable home environment, and had bonded with the child during visitations since her release from treatment).

Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk. *In re R.R.*, No. 02-13-00464-CV, 2014 WL 3953930, at *3 (Tex. App.—Fort Worth Aug. 14, 2014, no pet.) (mem. op.); *see also In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.) ("Developing case law has indicated certain acts or omissions which would demonstrate significant impairment of the child, such as physical abuse, severe neglect, drug or alcohol abuse, or immoral behavior on the part of the parent."). Likewise, the parent's treatment of other children may be relevant. *See In re S.D.*, No. 02-14-00171-CV, 2014 WL 6493783, at *15 (Tex. App.—Fort Worth Nov. 20, 2014, no pet.) (mem. op.) (stating that the trial court could have had legitimate concerns regarding appellant's involvement in or ability to have prevented older child's death given the length of his relationship with the child's mother, the fact that he had "supervised" her children before, and the presence of older scars on the deceased child). The link between the parent's conduct and harm to the child may not be based on evidence that merely raises a surmise or speculation of possible harm. *In re B.P., Jr.*, 2008 WL 2639264, at *2, *5.

19

## 2. Evidence

During the two-part hearing that began on May 11, 2015, Denise Hamilton, S.T.'s CPS conservatorship worker, testified that S.T. had lived with her foster family since her birth in November 2013 and was very bonded to her foster family.[18] By May 2015, S.T. was walking, climbing, and learning to talk. The trial court took judicial notice of the CASA report, which stated that the eighteen-month-old child was a happy, healthy, and lively child who could talk in short phrases and loved to dance and run.

### a. Father's Family Service Plan

Between January 13, 2015, when Hamilton first spoke with Father about his service plan, and May 11, 2015, Father had completed all but two of his services—he had consistently attended his two-hour visits with S.T. every other week and was appropriate with the child during those visits according to Hamilton,[19] had adequate housing, transportation,[20] and income,[21] and only had

---

[18]S.T.'s foster mother testified that S.T. was nine days old when she came into the foster family's home and that she weighed only four pounds, one ounce at that time. S.T. spent nine days in a neonatal intensive care unit before she was released to the foster family.

[19]Hamilton had seen Father change S.T.'s diaper, and she said that he brought S.T. gifts and food. Father said he had brought toys, snacks, clothing, and books to the visits and that he and S.T. would read books, talk, laugh, hug, kiss, and play with the toys. S.T.'s younger sibling, who had also been removed from S.T.'s mother but who was not Father's child, sometimes joined S.T. at the visits, and Father was appropriate with both children.

his counseling and parenting classes left to complete. Father completed his parenting classes between the first portion of the hearing and second portion nine days later; he was still attending individual counseling by the second portion of the hearing.

P.T. said that she had seen S.T. with Father and that based on what she had seen, he had demonstrated appropriate parenting skills with the child. Nevertheless, she testified that she preferred that his visits be supervised. S.T.'s foster mother testified that she took S.T. to and from visitation and had observed nine or ten of S.T.'s visits with Father. She stated,

> My concern with him is I've noticed he does interact with her, but he doesn't know how to console her. And whenever she gets -- she's not the easiest baby. She -- you know, she's been exposed to drugs and alcohol, and she -- when she gets upset, she gets, you know, easily upset. So, you know, you need to know how to calm her down. And I can see he gets easily frustrated with that.
>
> The way he shows that is by, you know, being more controlling. Instead of just allowing himself to put her down, he's very possessive and controlling with her. And that's concerning to me because I've seen -- at one visit I noticed that he wasn't able to console her and he just kept doing it, and he was getting even more irritated. So I went over and asked him is it okay if I, you know, take her and get her consoled, you know, for you. Is that okay? So he kind of paused a little bit and then handed her to me. She was fine

---

[20]Father drove himself to his visits with S.T. and lived in a three-bedroom furnished house that Hamilton said was appropriate for an eighteen-month-old child and that Father described as clean and tidy. Father said that he had a car seat for the child and had a bedroom set up for S.T. at his house. Father's house was owned by his father; Father paid only the property taxes.

[21]Father received between $2,700 and $3,095 per month from the Department of Veterans Affairs (VA).

21

after I got her. But as soon as I wanted to put her -- you know, hand her back over, she was not having it.

Terica Brager, the CPS supervisor on the case, testified that CPS had continuing concerns about Father's ability to parent, and Hamilton testified that it was not in S.T.'s best interest to name Father as a managing or possessory conservator because he had not yet completed his service plan and because of CPS's concerns about his criminal history. Hamilton acknowledged that it was extraordinary that Father had completed almost everything on his service plan during the five months that he had been involved in the case.

### b. Father's Criminal History

No certified copies of Father's convictions were offered or admitted into evidence, but some evidence was elicited at trial regarding his criminal history, primarily from Father himself.

With regard to the possession-of-heroin conviction for which he was on parole at the time of the May 2015 hearing, Father denied that he had used or sold the heroin but agreed that he had pleaded guilty to the charge. He also admitted to previously having been to jail for theft and to having been charged with two driving-while-intoxicated offenses. He stated that his burglary-of-a-habitation charge was dropped down to criminal trespass.

Father acknowledged that he had three assault convictions, and Hamilton testified that two of the assault-bodily injury convictions had occurred since 2010. Father described himself as "very generous, loving, kind," and testified that the

three assaults in his criminal history were self-defense-related.[22]  He denied

having ever hit S.T.'s mother, and S.T.'s mother denied that Father had ever hit

her, pushed her, or assaulted her or that she had ever seen him assault anyone

else.

S.T.'s mother testified that she did not believe S.T. should be placed with

Father and that his visits with her should be supervised because it seemed to her

that he had an "anger problem."[23]  Father denied having an anger problem but

pointed out that he had voluntarily taken and successfully completed an anger

management class, even though CPS did not ask him to do so.[24]

Father started receiving his veteran's benefits in 1993 and his criminal

convictions started accruing in 1996; he admitted that he committed theft of

---

[22]Father said that his oldest daughter's mother had been the complainant in one of his assault cases, a girlfriend had been the complainant in the second assault case, and an unrelated female had been the complainant in the third case.  One of the women needed medical care because "[s]he swung and [he] blocked her punch and then she broke her wrist or something like that."

[23]S.T.'s mother elaborated by saying she thought Father had an anger problem "[b]ecause sometimes when [she] was staying with him he would holler." She said that she did not think it would be good for S.T. to be around someone that hollered.

[24]Hamilton testified that Father had volunteered for the anger management class and had provided her with a certificate for it; he told her that it resulted in a recommendation for a psychological or psychiatric evaluation but that he did not think it was necessary because he had volunteered for the class.  Hamilton said that it concerned her that he was not willing to take an evaluation.  The record does not reflect that an anger management course or a psychological or psychiatric evaluation were ever made part of Father's service plan requirements.

property while he was collecting his benefits. His criminal history overlapped with his drug history, leading to an earlier possession charge involving drug paraphernalia containing crack cocaine, which Father admitted was his.

### c. Father's Drug History

Father said that he used crack cocaine between 1996 and 2003 and that between 2000 and 2003, he had had relationships with people who used drugs.

Father testified that he began a dating relationship with S.T.'s mother while she was taking CPS classes after her second son was born.[25] Their relationship lasted until around March 2014, when Father was incarcerated for possession of heroin. Father denied that he knew S.T.'s mother was using drugs while they were dating or while she was pregnant with S.T. Father denied having ever given S.T.'s mother any pills or other substances.

S.T.'s mother admitted to having used drugs during her pregnancy and up to the date of S.T.'s birth in November 2013. She said that Father knew she was using drugs when they dated and that although he did not use drugs with her, he had provided drugs to her, specifically, crack cocaine. S.T.'s mother said that Father did not provide her with drugs after he learned she was pregnant, but she also said that Father knew that she continued to use drugs while pregnant. Hamilton said that S.T.'s mother told her that Father had supplied her with drugs, although S.T.'s mother denied having told CPS that Father gave her drugs.

---

[25]S.T.'s mother's second son was born in January 2013; he and S.T.'s mother's oldest child both lived with S.T.'s great-grandmother.

Brager stated that DFPS's concern had not been that Father was using drugs but that he had perhaps provided them to others.

### d. Father's CPS History

Brager testified that CPS's continuing concerns about Father's ability to parent stemmed from his having been the father in another case in her unit and in an earlier CPS case and the fact that the three children of Father's that she knew about, including S.T., were not in Father's care, custody, and control. Brager stated that in the previous case in her unit, the child was removed because (like S.T.), she and her mother had tested positive to drugs at the child's birth, and the child was placed with a fictive kin[26] caregiver who was a friend of the child's mother. Father did not have any contact with the child prior to the child's removal from her mother.

Father acknowledged that CPS had been involved in the lives of all three of his children, giving rise to CPS's continuing concerns about his ability to parent. He said that his parents were the temporary managing conservators of his eight-year-old daughter but that he could change those arrangements. He had every-other-week supervised visitation with this child, who lived with his parents because at the time of her placement in March 2014, Father was on his

---

[26]A "fictive kin" is an unrelated person with a long-standing and significant relationship with the child. *In re V.U.*, No. 07-13-00243-CV, 2013 WL 6255694, at *1 (Tex. App.—Amarillo Nov. 20, 2013, no pet.) (mem. op.); *Melton v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00168-CV, 2010 WL 668917, at *9, *10 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.); *see also* Tex. Fam. Code Ann. § 264.751 (West 2014).

way to jail.[27] His three-year-old daughter, who he had not seen since December 2012 or 2013, lived in Dallas. Father said that the middle child's managing conservator had not complied with the visitation arrangements but that he had not filed an enforcement action to enforce visitation. No additional evidence was offered regarding the facts and circumstances of CPS's involvement with either of Father's other two children.

### e. Father's Mental Health

Father had been diagnosed with schizophrenia and had been discharged from the Army with a 100% mental health disability award. Although Hamilton testified that she had concerns about Father's compliance with his schizophrenia medication, Father said that the VA had prescribed medication for him to treat his schizophrenia and that he took his medication as prescribed. Father further testified that the medication prevented schizophrenia symptoms such as insomnia and hallucinations.

Father said that he had taken psychiatric evaluations in 2001, 2002, and 2004 through the Tarrant County criminal district attorney's office, in addition to the routine annual psychiatric evaluations with the VA.[28] No VA records or other records regarding Father's mental health were offered or admitted into evidence.

---

[27]Father did not clearly recall how old the child had been when she was removed by CPS, alternatively stating ages four, six, and eight.

[28]Father said that he had to have the annual evaluations with the VA because of his diagnosis and his medication. He had been receiving mental health benefits from the VA since 1993.

### f. Best Interest Recommendations

According to Hamilton, DFPS's recommendation was for Father to continue with supervised visitation and to complete his counseling. Hamilton testified that it was in S.T.'s best interest to name P.T. as her possessory conservator because P.T., as the child's maternal grandmother,[29] would be an appropriate relative caregiver, had moved into a suitable environment for the child, and had sufficient resources to take care of the child. Brager testified that P.T. had an appropriate place to live, had stable employment, and had a support system to meet S.T.'s needs and that DFPS's ultimate permanency plan was to grant P.T. permanent managing conservatorship of the child. Hamilton and Brager explained that DFPS's retaining managing conservatorship would give P.T. the opportunity to participate in the foster program so that she could receive financial help in taking care of the child and S.T. could receive free state college tuition. Brager also stated that with P.T. as possessory conservator, DFPS would have time to monitor the placement.

P.T. testified that she wanted the child with her and that she believed it was in S.T.'s best interest to live with her because she wanted the child to know

---

[29]The legislature's preference is that children removed by DFPS be placed with relatives. *See, e.g.*, Tex. Fam. Code Ann. § 262.114(a-2) (West 2014) (requiring DFPS to file a statement with the court to explain why the child has not been placed with a relative and the actions DFPS is taking to place the child with a relative). P.T. testified that she worked as a laboratory technician at the hospital where S.T. was in intensive care at birth but that she had not been allowed to go up to the nursery when she had influenza, and the child had been taken into foster care by the time she was able to enter the ICU.

her siblings and extended family. Although S.T. had lived with her foster family since birth, P.T. believed that because of her young age, S.T. would adapt quickly. P.T. testified that she and her ex-husband, S.T.'s maternal grandfather, would provide financially for S.T. S.T.'s mother also asked that the child be placed with P.T.,[30] and Father said he did not have any concerns about S.T. being placed with P.T. and that she would be his second pick after himself as placement for the child.[31]

The CASA report reflected that neither parent's attorney had allowed the CASA worker to have any contact with them. CASA recommended terminating the parents' rights to S.T.; alternatively, if the trial court could not find cause to free the child for adoption, then it recommended permanent managing conservatorship to DFPS for more time to consider the child's placement options. CASA also recommended that the trial court deny the parents' requests for possessory conservatorship.

---

[30]At the time of the May 2015 hearing, S.T.'s mother had another open CPS case involving her two-month-old child. She had also used drugs while pregnant with this younger child but had been "clean" for four or five months by the time of the May 2015 hearing. S.T.'s mother, who was still working the steps of her sobriety plan, agreed that her visits with S.T. should continue to be supervised.

[31]Father's testimony in this regard conflicts with a letter that he wrote to CPS earlier in the year in which he made bizarre allegations about a sexual relationship between P.T. and S.T.'s mother.

### 3. Analysis

There was no evidence regarding the child's desires, and any concerns about stability for the child by uprooting her from her foster family were apparently not a factor in the trial court's determination to place her with her maternal grandmother. However, there was some evidence that Father had a history of assaultive conduct and substance abuse and that he could become frustrated with the child. Although he denied the allegation, there was some evidence that Father had provided S.T.'s mother with drugs prior to her pregnancy, as well as evidence that he had possessed drugs, resulting in his recent criminal conviction. The trial court could have also questioned whether two-hour visits with the eighteen-month-old child every other week for five months was sufficient to determine whether Father had the necessary skills and abilities to handle the day-to-day management of such a young child, particularly in light of the fact that none of Father's other children lived with him and that he had had CPS cases involving all of them. And the trial court could have found that Father's schizophrenia was a continuing concern, particularly in light of all of the above. Therefore, we conclude that there is a more than a scintilla of evidence to support the trial court's determination that appointing Father as S.T.'s managing conservator would not be in her best interest because the appointment would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code Ann. § 153.131(a). We overrule the legal-sufficiency portion of Father's sole issue.

We nonetheless conclude that the evidence is factually insufficient in light of the deficiencies in the record referenced in our factual recitation above. Although the record shows that Father was involved in previous CPS cases involving his older children, no specific information about Father's acts or omissions regarding those children appears in the record. *Cf. id.* § 263.307(b); *S.D.*, 2014 WL 6493783, at *15. The evidence in this record reflects that Father had an appropriate house and income appropriate for the child's care and had completed his parenting classes by the second portion of the hearing. Other than DFPS's expressed desire for Father to finish his service plan, no one testified about any parental skills that Father lacked because of his failure to finish the counseling requirement—the only remaining service that he had to complete.

While Father had a history of substance abuse and criminal activities, nothing in the record showed that he had engaged in either since being released on parole, and, furthermore, Brager testified that use of drugs was not one of DFPS's concerns. While there was testimony that Father had schizophrenia, no evidence was offered or admitted to explain DFPS's speculation that he might not be compliant with his medication. As S.T. was removed from her mother at birth, there was no evidence offered or admitted to show that Father had abandoned S.T. *Cf. R.R.*, 2014 WL 3953930, at *3–4 (upholding trial court's determination when the evidence showed that the mother had a history of mental disorders, suicidal thoughts, postpartum depression, unemployment, frequent

moves, rarely took care of the child when the child lived with her, tried to give the child to acquaintances, and after voluntarily transferring her parental rights, never tried to visit the child or otherwise stay involved in his life and did not take any parenting classes); *B.P., Jr.*, 2008 WL 2639264, at *1–2, *5–6 (holding that the trial court did not abuse its discretion by concluding that appointing mother as child's managing conservator would significantly impair the child's physical and emotional development when mother failed to follow her service plan, missed several visits, and lacked stable employment, and child had extreme need for structure and stability because of his bipolar disorder and other mental health problems).

As set out above, the credible evidence in the record is too weak to overcome the presumption in favor of Father's appointment as managing conservator as in the child's best interest and is therefore factually insufficient to support a finding that appointing Father as S.T.'s managing conservator would significantly impair S.T.'s physical health or emotional development. *See* Tex. Fam. Code Ann. § 153.131(a). Therefore, because the trial court did not have factually sufficient evidence upon which to exercise its discretion, we sustain this portion of Father's sole issue.

## IV. Conclusion

Having sustained part of Father's sole issue, we reverse the trial court's judgment and remand the case for a new trial so that the parties can more fully develop the record.

31

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and SUDDERTH, JJ.

DAUPHINOT, J., dissents without opinion.

DELIVERED:  December 17, 2015