

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00017-CV

_____

IN RE S.N., Relator

Original Proceeding
324th District Court of Tarrant County, Texas
Trial Court No. 324-656801-19

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

### I. Introduction

In this original proceeding, relator S.N. (Mother)[1] seeks mandamus relief from temporary orders giving real party in interest C.C., a nonparent, equal access to seven-year-old J.C., adopted by Mother in 2017. Because the trial court clearly abused its discretion and because Mother lacks an adequate remedy by appeal, we conditionally grant mandamus relief and order the trial court to vacate its December 22, 2023 temporary orders granting C.C. possession of and access to J.C.

### II. Background

Mother, a licensed social worker, and C.C., a former police officer, never married. During their relationship, C.C. adopted her biological niece and gave Mother conservatorship rights to the child by agreement, and Mother reciprocated, adopting J.C.'s two siblings and giving C.C. conservatorship rights by agreement. J.C. was born in 2016 and placed with the parties during his infancy. When the parties' relationship ended in May 2017, they moved into separate homes and agreed to a one-week-on/one-week-off (50/50) possession schedule of all four children. Mother, who is a licensed foster parent, adopted J.C. in December 2017. However, she gave him C.C.'s last name.

---

[1]To protect the child's privacy, we use pseudonyms or initials to refer to the child and his family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8 cmt.

In 2019, C.C. sued to become J.C.'s sole managing conservator. Two years later, while the suit remained pending, Mother decided that J.C. would no longer follow the possession schedule, which had been formalized by court order as to the three older children.[2] Accordingly, C.C. had no contact with J.C. for 16 months—from June 2021 to October 2023—with the exception of a disputed incident in a doctor's office parking lot on October 27, 2021.

After a contentious de novo hearing on November 7, 2023, the trial court adopted its associate judge's order giving C.C. possession of and access to J.C. on the same 50/50 schedule as the other children. In an email, the trial court explained that its decision was based on the case's "very unique factual basis" and Justice Debra Lehrmann's concurring opinion in *In re C.J.C.*, 603 S.W.3d 804, 820–24 (Tex. 2020) (orig. proceeding) (Lehrmann, J., concurring). In a follow-up email in response to C.C.'s counsel, the trial court added that "under the specific facts of this case . . . denying [C.C.] access and possession would substantially impair the emotional development of the child."

## III. Discussion

Mother complains that the trial court abused its discretion when there was no evidence that she was an unfit parent or, alternatively, no evidence that denying C.C.

---

[2]A case involving the three older children is pending in another trial court.

possession of and access to J.C. would significantly impair his physical or emotional well-being.[3]

## A. Standard of review and applicable law

A writ of mandamus will issue if a trial court abuses its discretion and no adequate remedy by appeal exists. *C.J.C.*, 603 S.W.3d at 811. In determining whether to grant mandamus relief, an appellate court should defer to the trial court's factual determinations supported by the record. *Id.* But an appellate court may grant mandamus relief if the trial court fails to correctly analyze or apply the law, *id.*, as it did in *In re Derzapf*, 219 S.W.3d 327, 335 (Tex. 2007) (orig. proceeding) (grandparent access over fit parent objection), and in *C.J.C.* And there is no adequate appellate remedy from a trial court's temporary orders in a suit affecting the parent–child relationship (SAPCR). *See* Tex. Fam. Code Ann. § 105.001(e) ("Temporary orders rendered under this section are not subject to interlocutory appeal.").

Mandamus relief is available when a trial court erroneously permits a nonparent possession of a child over a fit parent's objection. *In re B.F.*, No. 02-20-00283-CV, 2020 WL 6074108, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, orig. proceeding)

---

[3]Because we conclude that there is no evidence to support a finding that Mother was an unfit parent, we do not reach her alternative issue or C.C.'s response in which C.C. argues that significant impairment is just one way to rebut the fit-parent presumption and that the presumption was rebutted here such that the trial court did not abuse its discretion. Mother points out that C.C.'s response "essentially asks this Court to ignore its own precedent and apply the significant-impairment standard found in . . . the grandparent-access statute," which, she argues, "expressly applies only to grandparents; it does not include ex-girlfriends like C.C."

4

(mem. op.) (referencing *C.J.C.* and *Derzapf*). This is because there is a presumption that a fit parent acts in the best interest of her child. *C.J.C.*, 603 S.W.3d at 807 (citing *Troxel v. Granville*, 530 U.S. 57, 68, 120 S. Ct. 2054, 2061 (2000)); *see* Tex. Fam. Code Ann. § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). In *Troxel*, the United States Supreme Court stated that so long as a parent "adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." 530 U.S. at 68–69, 120 S. Ct. at 2061.

A court may not infringe on a parent's fundamental right to make child-rearing decisions "simply because a . . . judge believes a 'better decision' could be made." *C.J.C.*, 603 S.W.3d at 807 (quoting *Derzapf*, 219 S.W.3d at 333). In *C.J.C.*, the supreme court held that "a court must apply the presumption that a fit parent—not the court—determines the best interest of the child in *any* proceeding in which *a nonparent* seeks conservatorship *or access* over the objection of a child's fit parent." *Id.* at 817 (emphases added).

In her concurring opinion in *C.J.C.*, Justice Lehrmann highlighted the unaddressed issue of how to evaluate whether the fit-parent presumption has been overcome. *Id.* at 821 (Lehrmann, J., concurring). She noted that the Family Code

provides a standard for resolving the question in proceedings between parents, e.g., Section 153.131 (requiring appointment of parents as managing conservators unless appointment would not be in the child's best interest because it would "significantly impair the child's physical health or emotional development") and in grandparent-access cases, e.g., Section 153.433(b)(2) (allowing a grandparent possession of or access to a child over a parent's objection when it is shown by a preponderance that denial of possession of or access to the child would "significantly impair the child's physical health or emotional well-being"). *Id.* at 821–22.

Justice Lehrmann also noted that the Family Code did not specifically address a possession-or-access award to a nonparent whose standing to file suit is premised on the "parent-like" role played in a child's life, i.e., by sharing a principal residence with the child, providing for the child's daily physical and psychological needs, and exercising guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents with their children. *Id.* at 822. She referenced post-*Troxel* out-of-state cases showing that

> in determining whether an award of visitation to a nonparent is in a child's best interest, courts may afford the requisite deference to a fit parent's decisions concerning his child while still giving due consideration to the effect on the child's well-being of severing, or significantly curtailing, contact with a person who has served in a parent-like role to the child over a significant period of time.

*Id.* at 823.

We addressed that issue four months after the supreme court issued *C.J.C.*  *See* *B.F.*, 2020 WL 6074108, at *1.  In *B.F.*, the trial court named the children's parents managing conservators but awarded to a nonrelative possessory conservatorship and possession of the children during the second and fourth weeks of each month and during certain weeks in the summer, along with video conference calls every Monday and Wednesday evening.  *Id.*  In the subsequent original proceeding filed by the children's father, we noted that, in light of *C.J.C.* and the facts—nonparent possession and access over a parent's objection—"[t]he *only* question left to decide relate[d] to Father's fitness as a parent."  *Id.* at *3 (emphasis added).  The father argued that no evidence was presented that he was anything but a fit parent, the nonparent did not specifically argue that he was an unfit parent, and we found nothing in the record to indicate that he was an unfit parent.  *Id.* at *3–4.  Accordingly, we held that the trial court had abused its discretion when it named the nonparent a possessory conservator and awarded her possession of and access to the children, and we directed the trial court to vacate its temporary order.  *Id.* at *4.

## B.  Evidence

Three witnesses testified at the temporary-orders hearing:  Jennifer Hawn, a Family Court Services employee;[4] C.C.; and Mother.  We will focus only on the testimony of Mother's fitness as a parent.[5]

---

[4]Mother argues that Hawn's testimony cannot be considered as an expert opinion. *See* Tex. Fam. Code Ann. § 104.008(a) (stating that a person "may not offer

7

Hawn testified that when she evaluated the children in 2021, J.C. was four years old. At that time, based on her interview with J.C., Hawn was concerned about alienation of affection of C.C. by Mother. After the associate judge ordered a supervised visit with C.C., on October 17, 2023, Hawn observed the hour-long visit. Hawn expressed concern during her testimony that J.C.—who, along with all three of his siblings, was African American—would no longer have a connection to that side of his heritage. She elaborated during redirect as follows, stating,

> What I was trying to say is that [J.C.'s] sibling group is going to have a mother the same skin color, that understands the trials in the world because of that skin color; and that J[.C.] will see that his siblings are getting that, and he will not be able to have that.

an expert opinion or recommendation relating to . . . possession of or access to a child at issue . . . unless the person has conducted a child custody evaluation relating to the child under . . . Chapter 107."). Hawn testified that she included J.C. in her custody evaluation of the other three children (in the parties' separate lawsuit involving those three children) because J.C. lived in the home with the other three and his status as a subject child was still in dispute. *But cf. id.* § 107.103(b) ("The court may not appoint a child custody evaluator in a suit involving a nonparent seeking conservatorship of a child unless, after notice and hearing or on agreement of the parties, the court makes a specific finding that good cause has been shown for the appointment of a child custody evaluator."). Because Hawn presented no evidence that Mother was an unfit parent, we do not reach this sub-issue. *See* Tex. R. App. P. 47.1.

[5]The testimony at the hearing was wide-ranging, covering C.C.'s chronic pain diagnosis caused in part during her seventeen-year career as a police officer, along with her related medications, a recent foreclosure on her home, and some injuries that J.C. suffered in her care, among other things. But most of this information has no bearing on *Mother*'s fitness as a parent, which C.C. did not contest in her live pleading in the SAPCR. To the contrary, although she alleged that appointing both of them as joint managing conservators would not be in J.C.'s best interest and that appointing her as sole managing conservator would be, C.C. requested in the alternative that she and Mother be named the child's joint managing conservators.

8

What I was not trying to say is that [Mother, who is Caucasian,] can't do that. In fact, she had culturally appropriate dolls in the home. She had lotions and hair stuff that was appropriate for the children. So that's what I was trying to say.

C.C. testified that Mother had notified her in June 2021 through Our Family Wizard that she had decided J.C. was no longer going to go to C.C.'s home. Mother told her this the day before C.C. was to pick up all four children. Seven-year-old J.C. now attends a different school from his siblings (who are ages 8, 10, and 12) and has a different pediatrician. When asked more than once during cross-examination if she thought Mother was a good mother, C.C. replied, "I can only say in regards to my children, and I think she could do a lot better" and "I can't answer that." On redirect, C.C. elaborated, stating,

I do believe she could do better with her interactions with my children. I think she could do better with solidifying their sibling relationship, exploring their culture, being tolerant of questions and things that are related to who they are and how they relate to the world. I think she can do better in advocating for my children medically and mentally.

C.C. also opined that Mother did not adequately care for J.C., although she admitted that when she saw him during their October 17, 2023 visit, he appeared healthy. Even though C.C. stated that J.C. had been "[e]motionally distant" in the visit and that "his smile wasn't the same, his eyes [weren't] the same," Hawn testified that after the first 30 minutes of the one-hour visit, J.C. opened up. Hawn stated that after the first 30 minutes, J.C. had been "very open, laughing, asking [C.C.] questions,

9

responding with longer responses to her questions." She noted that he also opted to sit in C.C.'s lap.

Mother testified that she had changed J.C.'s pediatrician after C.C. showed up at his October 2021 doctor's appointment, approached her vehicle, and banged on the window, which caused J.C. to start crying. Mother said that she became "quite nervous" and put her car in reverse and that if she had taken her foot from the brake, she would have hit C.C.'s car. C.C. denied having parked behind Mother to prevent her from leaving the doctor's office and stated that Mother was able to leave. C.C. testified that she had learned of the appointment because she had been listed as a parent on J.C.'s medical forms at that time, that Mother rushed J.C. to the car when she saw C.C., and that J.C. saw her and started crying. C.C. claimed that J.C. had reacted to seeing her by "saying something to the effect of, 'Open up the window, Mama, Mama, Mama.'"

Mother testified that she had chosen J.C.'s school based on the diversity of students and teachers and the academic rigor and stated that she would have put the other three children in that school except for the court order that designated which school they had to attend.

Mother described J.C. as a straight-A student, with asthma, seasonal allergies, and a mild case of eczema. She opined that J.C. had done well since 2021, stating, "He's social, he's engaging, he's happy, he makes friends, he has neighborhood friends, he has peer relationships at school; has peer relationships at day care, when he

10

goes, during breaks," and he was "classroom leader at the end of kindergarten, in May." Various photographs of J.C. that were admitted into evidence support Mother's testimony about his health and well-being.

Mother stated that J.C. was exposed to African American culture through his siblings; his school, which was predominantly African American; participation in school events, including Black History Month; and participation in community events, including "[Historically Black College and University (HCBU)] step shows." She also testified that they had tickets to see "Michael Jackson, The Musical." When asked whether she noticed a change in J.C.'s behavior when the other three children went to C.C.'s home for the week, Mother stated that he was "very excited to have one-on-one time." When asked about the other three children's having a relationship with C.C. and J.C.'s not having that relationship—"And you believe that does not have any type of emotional impact or psychological damage on [J.C.]?"—Mother replied, "I believe [J.C.] is perfectly healthy and is doing quite well."

## C. Analysis

During the hearing, the trial court expressly disagreed that C.C. was not entitled to access to and possession of J.C. unless she overcame the "fit parent" presumption. This was error. *See C.J.C.*, 603 S.W.3d at 817. And, as set out above, the record does not reflect a finding or any evidence that Mother is an unfit parent. Because there is no evidence or finding that Mother is unfit, it is Mother in the first instance, and not the trial court, who is to determine whether to allow C.C. access to or possession of

11

J.C. *See id.* at 820; *see also B.F.*, 2020 WL 6074108, at *4 (reaching same conclusion based on lack of evidence of unfit parent). Because the trial court did not address the "fit parent" presumption, we do not reach the question of whether a showing of significant impairment might be sufficient to overcome that presumption.[6] *See N.H.*, 652 S.W.3d at 496 (interpreting *C.J.C.* to hold that the fit-parent presumption is rebuttable and that, if the parent is fit, then the trial court is "required to presume that [the parent] acted in the best interest of the [c]hild when she decided how frequently or infrequently to allow visitation with the Ex-Girlfriend").

---

[6]We nonetheless note that, to the extent that the "significant impairment" standard may apply in nonparent access-and-possession cases—a question that we leave to the Legislature to resolve as it has in Family Code Sections 153.131 and 153.433(b)(2)—none of the evidence in this case meets that standard as discussed and defined by this court in *In re S.T.*, 508 S.W.3d 482, 491–92 (Tex. App.—Fort Worth 2015, no pet.). Acts or omissions constituting "significant impairment" include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior, and evidence of past conduct may not, by itself, be sufficient to show present unfitness. *Id.* at 492. Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to the put the child at risk. *Id.* And the link between the parent's conduct and harm to the child may not be based on evidence that merely raises a surmise or speculation of possible harm. *Id.* at 492–93; *see also In re N.H.*, 652 S.W.3d 488, 497 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (noting that "other provisions reflect a legislative judgment that there must be a showing of harm to the child before any sort of nonparent can obtain court-ordered visitation" and that they "all evince a policy judgment that the fundamental rights of parents cannot be infringed by a court absent some compelling reason, and that reason must typically involve the health and welfare of the child").

## IV. Conclusion

Based on the above, we conditionally grant mandamus relief, order the trial court to vacate its December 22, 2023 temporary orders granting C.C. possession of and access to J.C., and release our stay of February 5, 2024.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: February 13, 2024