# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00010-CV

---

**In re M. L.**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 320,843-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Z.L. (Mother) appeals from the trial court's order appointing her as possessory conservator for her son, M.L., who was born in January 2012, and appointing Z.K. (Stepfather) as sole managing conservator.[1] We affirm the trial court's order.

### PROCEDURAL AND FACTUAL SUMMARY

Mother, who testified through a translator, is from China. She and M.L. moved to the United States with Stepfather in 2016. Stepfather is in the Army, and the family moved to Texas in 2019 after Stepfather was stationed here. In November 2020, the Texas Department of Family and Protective Services filed a petition seeking conservatorship, attaching an affidavit—which was admitted into evidence at the final hearing—that explained that in October 2020, it had received a report that Mother "may be borderline suicidal," had a history of domestic

---

[1] We refer to the child by his initials and to his family members by their titles. *See* Tex. R. App. P. 9.8. M.L.'s biological father lives somewhere in China but has had no contact with M.L. or Mother since Mother and Stepfather got married.

violence against Stepfather, and "is on the verge of hysteria." There were "concerns that [Mother] barely feeds" M.L., and M.L. had sent Stepfather, who was deployed at the time, a message stating that Mother had given him a bloody nose.

After receiving the referral, the Department spoke to M.L. and Stepfather, who had been staying at Stepfather's friend's home since August. Stepfather reported that Mother had been "physically abusive, manipulative and emotionally abusive towards him for about four years." He described a 2017 incident in which Mother "said she was going to kill herself" with a pair of scissors and "came out of the bathroom naked with blood dripping down her legs and began to attack [Stepfather] in front of" M.L., who was "shaken up due to seeing his mother's private area." Stepfather called the police, who took Mother to be evaluated for suicidal tendencies. Stepfather had returned home in August 2020 from a months-long deployment and reported that while he was deployed, Mother had sent him texts stating that she "didn't want" M.L. anymore, that she did not like M.L., and that "the only way to control [M.L.] was with a knife." Stepfather said that when he returned home, Mother was "moody" and would yell at M.L. when she got upset and that M.L. had told Stepfather that "his mom sat on his head and made his nose bleed." In August, after Mother threw books at Stepfather and "threatened him" with pliers, Stepfather left to stay with his friend. Mother would not allow M.L. to go with him, but later that night, she "showed up to the home with" M.L., left M.L. with Stepfather, "and sat in her car outside the home all night."

The investigator spoke to M.L., who stated that Mother "will 'do something random' like hit him when she becomes angry" and that "it is hard to know what his mom will hit him with." M.L. alleged that Mother had "hit him with a torch and tried to 'set him on fire,'" that he had "gotten 'a few' marks and bruises" from her attacks, and that she had "stabbed a hole

2

in" one of M.L.'s stuffed animals "to 'frighten him.'" M.L. said that he had seen Mother "whip" Stepfather with a charger cable and that Mother had come to Stepfather's friend's home twice, resulting in the police being called. M.L. also said that "one time his mom got under the truck at the park and wouldn't let them leave the park in the vehicle." M.L. did not know when the various incidents had occurred but said "most of them" occurred during Stepfather's deployment. M.L. "admitted being afraid of his mother and that he did not want to go home."

Stepfather's friend told the investigator that he called law enforcement multiple times due to Mother's behavior, reporting that Mother "would force her way into his home" when Stepfather was there. He had also seen Mother "force her way under [Stepfather's] vehicle" and refuse to get out, and M.L. had told the friend "that he is fearful to return home to" Mother. When the investigator spoke to Mother, she "admitted to feeling 'down' and overwhelmingly sad and that she had acted out on those feelings toward" Stepfather and M.L. She admitted that she had stabbed M.L.'s stuffed animal; "grabbed a pair of scissors and suffered from an emotional breakdown in front of her son"; and sent Stepfather texts saying she "didn't want [M.L.] and that she didn't love him." However, she said she wanted M.L. to live with her. The investigator expressed concerns that Mother "has little control over her temper and is exhibiting inappropriate discipline" towards M.L. and that M.L. "is frightened to return home to [Mother] and feels unsafe around her."

Stepfather filed a petition in intervention asking to be appointed M.L.'s sole managing conservator, and in December 2020, the trial court signed temporary orders appointing the Department as temporary managing conservator and Stepfather as temporary possessory conservator and placing M.L. with Stepfather. M.L. was placed in a foster home from March to September, while Stepfather was deployed, and returned to Stepfather in September.

A final hearing was conducted over two days in November and December 2021. By that time, Stepfather and Mother had started the divorce process. M.L. was described by the various witnesses as a highly intelligent child, and Stephanie Classen, his most recent therapist, testified that he had displayed "a lot of anxiety," "present[ing] with very short fingernails" and "hands that were blistered from either sucking or biting on his hands" and talking "about anxious symptoms such as fears, unable to sleep, those types of things." M.L. told Classen "that he's been through quite extensive abuse from his mother" and "that he would spend a lot of nights awake worried that his mom would find him in his foster home." M.L. also reported that "his mom set him on fire"[2] and that he had seen Mother "whip his stepdad with a cell phone charger." M.L. does not want to live with Mother but wants to continue visits because "he's scared of making [Mother] mad if he does not visit" and "he's scared when she is mad." M.L.'s primary focus when discussing Mother is describing "previous abuse, what's keeping him up at night, why he's checking the locks over and over at night, his fears that he's worried she will come into the school, come into the foster home, reasons why he is attending visitations." Asked whether she encouraged M.L. to have a relationship with Mother, Classen answered that she did not "try to coach kids one way or the other." She "would ask him his opinion, 'Do you want visits with your mom?' when he would discuss the abuse, and his answer was consistently, 'I want to visit my mom because I do not want to make her mad.'" Classen never asked if a specific person had been abusive and instead asked "what type of trauma and abuse he has been through," and M.L. never mentioned Stepfather other than to say he saw Mother whip Stepfather with a cord.

---

[2] Classen was asked about the difference between the allegation in the Department's affidavit, which Mother's attorney described as being that Mother "threw a candle at M.L.," and M.L.'s characterization of the incident as being "set on fire." Classen answered that the discrepancy was "not concerning" to her.

Classen explained that M.L. had moved in with Stepfather after he decided he "want[ed] to go live with his stepdad because his stepdad is not mean." M.L. had missed Stepfather while he was living with the foster family, was happy and excited to be reunited with him, and was excited to return to his previous school. M.L. still exhibits signs of anxiety but they had decreased since he moved back in with Stepfather. M.L. was aware that Stepfather and Mother are divorcing, and Classen "believe[s] he was at peace with the divorce." Classen recommended that M.L. remain in Stepfather's care and that he not live with Mother. Classen was asked about what should happen if Stepfather, who is in the military, is deployed, and she answered that Stepfather should be allowed to decide who should be a caregiver and "[w]hatever he decides to do[,] that would be his decision." Mother's attorney asked whether such a situation provided M.L. with stability, and Classen answered, "I mean, children do move. Is it the best? I mean, it creates some stress, but children move all the time."

Classen believed it would significantly impair M.L.'s physical health or emotional well-being if he were to live with Mother. She also believed that M.L. should have "permission to say if he wanted to or did not want to visit his mother," explaining that she recommended he have that agency "[d]ue to the extreme abuse that he has reported that's occurred between he and his mother and due to his emotional and intellectual maturity." Classen recommended that visits "be in a therapeutic situation so that if [M.L.] exhibits traumatic responses that can be therapeutically managed if certain things happen, such as certain precautions need to be taken as far as kidnapping or telling [M.L.] that he is a liar." Classen testified similarly about whether Mother should be allowed to attend extracurricular events, saying that if M.L. was "enjoying reconnecting with his mother," such contact would be appropriate, but that if "the trauma of seeing his mom becomes too much," the contact should be stopped.

Terri Schroeder has been providing therapeutic visitation services to Mother and M.L. since May. She testified that Mother and M.L. "seemed to interact well" but said that when she speaks to M.L. before visits, "he is very clear that he does not want to be alone with his mother and that if the littlest thing goes wrong between them he does get very, very anxious." M.L. "does not seem to feel very close [to Mother], and he says he does not feel safe with her." He does not want to be alone with her because "she scares him when she gets angry" and "she has hurt him in the past." Schroeder described a day when Mother was late to a visit—Schroeder started to call to see if she was on the way, and M.L. "begged [Schroeder] not to call her and said he just wanted to leave." Although M.L. interacts and plays games with Mother during visitations, he "is not very open and talkative with her," and at the end of visits, "[t]here's never any crying, any sign of reluctance. He goes off to his dad's—or his stepdad's car without any complaint and seems to be perfectly fine with ending the visit." Schroeder said M.L.'s behavior with Mother is "in major contrast" to his behavior with Stepfather, with whom M.L. "seems very much like a different child. He smiles, he laughs, he chatters with his stepfather, he seems glad to see him." Schroeder also testified about some of her discussions with Mother and said:

> I have talked to her about, for example, the whole "she sat me on fire" thing. She says it's not true, and clearly he's got no scars, he wasn't set on fire. But trying to talk to her about the difference between objective reality and how [M.L.] thinks about things has not gotten any difference in behavior. Mom tends to be very logical and she deals more with her version of reality than how [M.L.] feels about anything.

Schroeder was asked for her opinion about visitations moving forward, and she testified that M.L. "is old enough to know his own mind" and that the morning of the hearing, he had said that "he does not feel safe alone with his mother, and he does not want to be alone with

6

her." Schroeder said, "I always want to try to repair a parent-child relationship, and I would support having supervised therapeutic visitations or family therapy as long as [M.L.] does not refuse, . . . but I don't think he should be alone with her when he doesn't want to be." She also thought that M.L. should be able to speak to Mother on the phone if he wants to do so.

Kelly Milbauer, the Department conservatorship worker who had taken over the case from another caseworker several months earlier, explained the reasons for the Department's involvement with the family and about some of the requirements of Mother's family service plan. Mother had worked services, other than being unsuccessfully discharged by her Department-arranged therapist, and had reported that she had acquired a new therapist. Milbauer testified that none of the therapists involved in the case had recommended unsupervised visitation or a monitored return to Mother's care. Milbauer thought that Stepfather has been a part of M.L.'s life for seven to eight years, since "a little before he turned 2 years old." Milbauer had no concerns about Stepfather and testified that Stepfather was meeting all of M.L.'s needs, was taking him to therapy and medical appointments, had him enrolled in school and extracurricular activities, and was providing a "safe, suitable home." M.L. appears bonded and comfortable with Stepfather and has expressed no concerns about Stepfather, and Milbauer said that M.L. had told her his opinion on where he wants to live and that continuing to live with Stepfather was "in line with what's been expressed to [her] by [M.L.]." Milbauer testified that placing M.L. with Mother would have a negative effect on his emotional and physical well-being, explaining that she had concerns that Mother might be physically abusive in the future and that she had doubts as to whether Mother could meet M.L.'s physical and emotional needs. She said that the Department recommended that Stepfather be appointed sole managing conservator, that Mother be appointed possessory managing conservator, and that Mother have

"[t]hird-party supervised visits." Milbauer also agreed that M.L. should have the ability to "decide if he wants to see his mother."

Debbie Belviy, M.L.'s guardian ad litem, testified that M.L. is "a very smart little boy," that he "has told [her] from the very beginning that he wants to stay with [Stepfather]," and that he had never expressed a wish to live with Mother. Stepfather's home is safe and suitable, Belviy said, and M.L. was "very comfortable there." Belviy testified that she had no concerns about the placement with Stepfather and that M.L. had never expressed any concerns either. He had, on the other hand, "adamantly" said "from the very beginning of this case that he does not want to be with his mother. He is afraid of his mother. He has said that time and time again. He's never wavered from that, and so he does not want to . . . live with" Mother. M.L. had told Belviy that Mother "tried to set him on fire" and "stabbed his favorite stuffed animal," and he never wavered or recanted those allegations. In addition, M.L. had expressed concerns about visitation and "just about every visit that we have," says he is afraid of Mother. Belviy testified:

> When we first started the case, he was terrified to go, and we had to assure him—I had to tell him that they would be at the Department, at—there was a mirror up in the room, and on the other side of the mirror CPS would be right there, and then he was okay with that. And then being with the—someone else in the room, like the therapist, he's okay with that. He does not—and he has stated from day one, he does not want visitation with his mom alone. He's afraid of her and doesn't want to be alone with her.

M.L. "gets a little anxious" when Belviy asks about Mother and had expressed concerns that Mother would "break in and try to steal" him or take him from school. Belviy said that it had taken "a lot" to "get him to the point where he's okay and comfortable" and feels safe.

Asked if she had concerns that placing M.L. in Mother's care would negatively affect his physical or emotional well-being, Belviy answered, "Absolutely." She agreed with the

8

Department's recommendations that M.L. should be allowed to stay with Stepfather, as M.L. wished, and that his visitations with Mother should be supervised in a therapeutic environment, testifying that she believed those recommendations were in M.L.'s best interest. She also testified that she thought that allowing Mother to attend school functions "would only heighten his anxiety" unless he was "okay with it."

Belviy said she had not talked to M.L. about spending time with both parents because "any time you talk about mom's visitation at all, it just heightens his anxiety." Asked whether she would be surprised to hear that M.L. had recently told Mother that he wants to live with her, Belviy said, "Well, yes and no. [M.L.] doesn't want to hurt his mom's feelings. He loves his mother, but it doesn't change the fact that he is still scared of his mother." Mother's attorney asked whether M.L. might also be afraid of Stepfather, and Belviy answered, "Yeah, but he did spend time in a foster home and never wavered and always wanted to go back to [Stepfather] and not to mom, so . . . I would be hesitant on agreeing with that." Belviy did not believe that Stepfather had coached or coerced M.L. into making false allegations.

Laura Dvareckas, one of Mother's neighbors, testified that she met Mother in early 2020, while Stepfather was deployed, and that her son played with M.L. regularly until June 2020, when the pandemic caused everyone to separate. Dvareckas did not have any concerns about M.L.'s behavior with Mother or about Mother's behavior and never saw Mother discipline M.L. M.L. never had visible bruises and never reported that he feared Mother, nor did he ever have trouble when it was time for him to go home. Dvareckas testified that she was surprised by the allegations against Mother and that she did not believe them.

Charles Schnapp also testified on Mother's behalf, explaining that he met Mother in the summer of 2020 and that he had never seen Mother be aggressive, yell, or act violently.

9

He never had any concerns about M.L.'s safety and did not believe that Mother posed a danger to M.L. After the Department's case started, Mother told Schnapp "that there were difficulties with her husband that to me sounded like . . . things you wouldn't expect from a husband that would be like psychological oppression or something." Mother also told Schnapp that Stepfather had coerced her into having unwanted abortions that she underwent because "she wanted to stay married." Although Mother told Schnapp "that fights started" with Stepfather, Schnapp said, "I can't tell you about the fights or why or how far they went, but there were fights." Schnapp met Stepfather once and said that "little concerns were raised just in meeting him . . . . My radar went up and I just thought it was a little strange." Schnapp did not believe that Mother had been treated fairly and believed that she had been "brought here to this country and then pretty much isolated and left to figure things out for herself."

Mother testified that the family lived in several states while Stepfather was deployed and that he often lived apart from Mother and M.L. Stepfather was deployed for almost a year in 2019-2020, during which time Mother was M.L.'s primary caretaker and M.L. never said that he was afraid of her or did not want to live with her. Mother denied abusing M.L., specifically denying throwing a candle at him or setting him on fire, and said that for discipline, she used time-outs or occasional spankings. Mother testified that she had "some abortions" during the marriage and that Stepfather never helped her get help for depression. Asked about domestic violence between her and Stepfather, Mother said:

> I don't want say it. That's all past. I did something wrong, too. Something happened to me. I can't forgive. I have hard time for that. A long time for that. I'm so sorry for that. If he did something wrong to me, I already forgive. I don't want to talk about it.

10

She also said, "[T]he thing at last I just threw the pillow, I threw the phone charger to him, and I yelled at him. I threw the paper flower I made for him." Mother testified that M.L. never had problems with anxiety until after Stepfather returned and that he was happy and did well in school when she was his primary caretaker. She further said that during her visitations, M.L. was always happy to see her and never said he was scared of her.

Stepfather testified about the apartment where he lives with M.L. and said that M.L. was doing well in school and had no attendance or discipline problems. He met M.L. in 2015, started living with M.L. and Mother in 2017, and had been with M.L. continuously since then except for seven weeks of training and an eight-month deployment. Stepfather testified that he and Mother had "an altercation" in 2017 but that he and Mother did not seek counseling after it. Stepfather was asked about the allegation that Mother was suicidal and whether he had sought help for her, and he answered that he "only found out after the fact." Stepfather testified that he had tried to get Mother mental health help and that he took her to an Army facility "to address the depression but they wouldn't help her because she was pregnant." Mother miscarried that child, and although Stepfather agreed that he took Mother to have at least one abortion, he testified that he had wanted "those children."

Stepfather testified that while the Department case was pending, Mother had initiated an investigation against him for allegations of physical and sexual abuse; that case was closed without charges about two weeks before the hearing. Stepfather said that deployment was possible, that "[t]here's none planned right now," that he was "working on a family readiness plan," and that his parents were getting credentialed as foster care providers. Stepfather agreed that he could not communicate with Mother right now but believed that they could in the future. He explained that he had changed his phone number and had not given Mother his new number

11

because things were not "cordial" at the time, she had installed "a stalker app" on his phone, and he did not "want inappropriate calls at all hours." He was willing to consider getting M.L. a phone as long as it is not a distraction at school.

Stepfather was also willing to set up a visitation plan that was best for M.L. and believed that for the time being visits should continue to be supervised and for two hours a week. He was "a little bit uncomfortable" with allowing Mother to have telephone contact with M.L. because of Mother's past conduct but said, "It's certainly something we can discuss in the future." He agreed with Classen that it was a good idea to give M.L. the ability to choose whether to have visitations and believed M.L. was mature enough to make that decision. Stepfather said that if M.L. decides that he wants to see Mother, Stepfather and M.L. "will discuss it and see specifically what he would like to do. If he is, down the road, feeling safer, we can certainly talk about different options." He said that he wanted M.L. and Mother to have a relationship and that if M.L. were comfortable having Mother at extracurricular activities, he would "get over [his] hang-ups." He explained that his concern about Mother attending such activities "is making a scene, but if she can control herself I'd be okay with it."

On December 9, the trial court signed a memorandum ruling stating that it had determined that Stepfather should be appointed sole managing conservator with the right to designate M.L.'s primary residence, that Mother should be appointed possessory conservator, and that the Department should be removed as temporary managing conservator. On January 19, 2022, the court signed an order appointing Stepfather as M.L.'s sole managing conservator and Mother as possessory conservator after finding that her appointment as managing conservator "would significantly impair the child's physical health and emotional development." The court also found that the standard possession order was not in M.L.'s best interest and ordered that

12

Mother should have visitation "at all times as agreed in writing by" Stepfather or, failing agreement, should have supervised visitation twice a month two hours each visit. The court also ordered Stepfather to enroll M.L. in counseling, gave M.L. the ability to have telephone or video contact with Mother "as the child desires," and authorized Mother to attend extracurricular activities if invited by M.L.

## DISCUSSION

Mother argues on appeal that the trial court abused its discretion in finding that appointing her as managing conservator would not be in M.L.'s best interest because it would significantly impair his physical health or emotional development.

The "fundamental concern" in a conservatorship decision is "the child's ultimate well-being." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The family code requires that a parent be appointed as a managing conservator unless the court finds that such an arrangement "would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional well-being." Tex. Fam. Code § 153.131(a). The evidence must raise more than a suspicion or speculation of possible harm and instead "must support the logical inference that some specific, identifiable behavior or conduct of the parent will probably harm the child." *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied) (citing *In re De La Peña*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.)). The types of conduct that can constitute significant impairment "include, but are not limited to, physical abuse," "parental irresponsibility, a history of mental disorders and suicidal thoughts," or "an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.).

13

"The trial court has wide latitude in determining the best interests of a minor child," *In re W.M.*, 172 S.W.3d 718, 724 (Tex. App.—Fort Worth 2005, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)), and a finding that a parent's appointment as managing conservator would significantly impair the child's well-being is reviewed for an abuse of discretion, meaning it "may be reversed only if the decision is arbitrary and unreasonable," *J.A.J.*, 243 S.W.3d at 616. The trial court "is wisely vested" with the discretion to determine conservatorship issues because it "is best able to observe the witnesses' demeanor and personalities." *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied).

A trial court does not abuse its discretion if some evidence of a substantive and probative character exists to support the court's decision. *Id.* Under this standard, legal and factual sufficiency challenges "are not independent grounds of error" but instead are "relevant factors" in considering whether the court abused its discretion. *Id.* We ask (1) whether the trial court had sufficient information on which to exercise its discretion; and (2) whether the trial court erred in its application of discretion. *Id.* at 587-88. "The traditional sufficiency review comes into play with regard to the first question," but our "inquiry does not end there" and we instead proceed "to determine whether, based on the evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable." *Id.* at 588.

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which she did not have the burden of proof, she must demonstrate that there is no evidence to support the finding, meaning that, when we credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not, (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to

14

prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id*.; *see City of Keller v. Wilson*, 168 S.W.3d 802, 828 (Tex. 2005). In challenging the factual sufficiency of an adverse finding on an issue on which she did not have the burden of proof, the appellant must demonstrate the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, considering all the evidence in the record. *Zeifman*, 212 S.W.3d at 589.

Mother argues that there was no or at least insufficient evidence to show that at the time of the final hearing she was unfit to be appointed managing conservator, noting that she had completed most of her services and had arranged for a new therapist after being discharged from the Department-arranged therapist. She also states that she admitted to domestic violence between her and Stepfather and that she yelled at M.L. and stabbed one of his stuffed animals but "made it very clear that she never abused him physically." Thus, she asserts, her actions "do not rise to the level of significant impairment." She further argues that M.L.'s therapists have only talked to him about "past trauma and some coping mechanisms" and have never talked to him about Mother's progress in services or in achieving stability. She asserts, therefore, that the evidence merely raises a suspicion or speculation of possible harm and not a logical inference that specific, identifiable behavior by Mother will likely endanger M.L.

Mother's arguments, however, are belied by the fact that multiple witnesses testified that M.L. described being physically abused by Mother and repeatedly said that he was frightened of her. M.L. described feelings of anxiety because he thought she might try to break into his house or his school and take him away. He told Stepfather that he was afraid Mother might kill him, and he told other witnesses that he had seen her whip Stepfather with an electrical cord and that she had thrown a candle at M.L. or had "set him on fire." Further, one of the

15

allegations underlying the Department's initial involvement with the family was that Mother was suicidal and emotionally unstable, an allegation supported by information obtained in the Department's investigation and testimony at the hearing. Classen, Schroeder, Milbauer, and Belviy all agreed that it would significantly impair M.L.'s well-being if he was returned to Mother's care and that it was in his best interest to live with Stepfather instead of Mother and to have some agency and control over when and whether he would have contact with Mother. The record also shows that M.L. expressed strong feelings of anxiety about living with Mother; that he said he did not feel safe with Mother; that he strongly and repeatedly expressed a desire to live with Stepfather; that he appeared happier, more open, and less anxious since being placed with Stepfather; that Stepfather was providing a stable home and meeting all of M.L.'s needs and could continue to do so in the future; and that Stepfather intended to continue taking care of M.L.

Further, Mother, in her discussions with Schroeder, focused on her "version of reality" and the literal fact of whether she had actually set M.L. on fire and did not seem to grasp that M.L. had fears based on her conduct. And although Mother testified that M.L. had never said that he was afraid of her or acted like he was afraid of her, other witnesses testified that M.L. loves his mother but also fears her and has told them that he wanted to continue visitation because he was afraid of making her angry. The fact that Mother denied physically abusing M.L. does not require us to find in her favor—it was for the trial court to hear the witnesses, consider their demeanor, and evaluate their credibility, and we may not second-guess those determinations. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) ("Because the factfinder 'is the sole arbiter of the witnesses' credibility and demeanor,' appellate review must defer to the trial court's factual determinations, even in parental termination cases." (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009))).

16

Given that the trial court is the sole arbiter of witness credibility, *see id.*, we hold that the evidence presented at the final hearing supports a finding of specific acts by Mother that will likely endanger M.L.'s well-being, *see B.B.M.*, 291 S.W.3d at 467; *see also S.T.*, 508 S.W.3d at 492 (physical abuse, mental disorders, and suicidal thoughts can constitute significant impairment). We therefore conclude that sufficient evidence supported the trial court's determinations that appointing Mother as managing conservator would significantly impair M.L.'s physical health and emotional well-being and that appointing Stepfather as sole managing conservator is in M.L.'s best interest. *See* Tex. Fam. Code § 153.131(a); *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (in considering best interest, courts should consider child's desires, child's emotional and physical needs now and in future, emotional and physical danger to child now and in future, parenting abilities of individuals seeking custody, programs available to assist individuals in promoting child's best interest, competing plans for child, stability of home or proposed placement, parent's acts or omissions indicating improper existing parent-child relationship, and any excuse for parent's conduct); *see also In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (*Holley* factors are not exhaustive and not all must be proven). We overrule Mother's issue on appeal.

## CONCLUSION

Having overruled Mother's issue on appeal, we affirm the trial court's order appointing Stepfather as M.L.'s managing conservator.

_____

Darlene Byrne, Chief Justice

17

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed:  May 19, 2022