# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00432-CV

---

### C.S.D. and J.D., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY
### NO. 21-FL-628, THE HONORABLE CHRIS SCHNEIDER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

C.S.D. (Mother) and J.D. (Father) appeal from the trial court's order appointing maternal great uncle and great aunt (Intervenors) as non-parent managing conservators of three of Mother and Father's children: Chris and Justin, twin boys who were three years old at the start of trial, and Cynthia, who was almost two years old at the start of trial.[1] Mother and Father were appointed possessory conservators of all three children with a modified possession order. *See* Tex. Fam. Code §§ 153.131(a) (presumption favoring appointing parent as managing conservator), .191 (presumption favoring appointing parent as possessory conservator). On appeal, Mother and Father challenge the sufficiency of the evidence supporting the appointment

---

[1] Mother and Father's fourth child, Emmitt, was born during the course of the underlying proceeding and is the subject of a separate Department case. For their privacy, we will refer to the children by aliases and to their family members by their relationships to them or by aliases. *See* Tex. R. App. P. 9.8.

of Intervenors as managing conservators. For the following reasons, we affirm the trial court's order.

## BACKGROUND

On December 21, 2021, the Department of Family and Protective Services (Department) received an intake when Cynthia tested positive for methamphetamine while being treated at a hospital. The Department filed its original petition on the same day, seeking emergency removal of Cynthia, Chris, and Justin and the termination of Mother's and Father's parental rights. The trial court entered an order removing the three children and placed them with Intervenors, where they remained for the entirety of the case. In or around May of 2023, the Department changed its primary goal from termination to relative conservatorship, and Intervenors thereafter filed intervention petitions on June 7, 2023, seeking appointment as managing conservators of the children.

A jury trial was held from June 12 through 16, 2023, during which the Department sought the appointment of Intervenors as managing conservators and the appointment of Mother and Father as possessory conservators.[2] Mother; Detective Brandon Farrell; Arlene Castro, the Department investigator; Father; three drug testing witnesses; Melissa Seibert, clinical psychologist; Intervenor Great Uncle; Jill Rodriguez, CASA volunteer; Brittany Herzog, parenting coach; Amanda Swafford, Department caseworker; Curtis Laurence, marriage counselor; Paternal Grandmother; and Joseph Mcadoo, a family friend, all testified during the multi-day trial.

---

[2] Intervenors attended the hearing but declined to ask questions or make opening statements or closing arguments.

2

Mother, who was almost 23 years old at the time of trial, testified that she currently has four children—Justin, Chris, and Cynthia, who were the subject of the underlying proceeding, and Emmitt, who was nine months old and subject to a separate Department case—and was pregnant with her fifth child, due in September. Mother testified she was still married to Father at the time of the trial, and that she had met Father when she attended school with his now adult sons.

Mother testified that in 2020 she and Father were involved in a prior Department case in 2020 while she was pregnant with Cynthia. Mother confirmed that she tested positive for only marijuana during that prior case, but that Father had tested positive for methamphetamine. Mother disbelieved Father's test result because she said that Father did not use methamphetamine. Rather, she posited that the positive test result was caused by Father taking Sudafed, an over-the-counter medication.

Mother testified that on December 21, 2021, Father's sister (paternal aunt) brought Cynthia over after Mother "got home from doing a few Lyft rides," but that Mother soon noticed that Cynthia "didn't seem right," and after Cynthia threw up, Mother took her to the hospital. At the hospital, Cynthia tested positive for methamphetamine and was admitted for several days. Mother testified that she told the Department and the police that she believed the methamphetamine came from paternal aunt. Mother testified that she had been told "from an outside source" that paternal aunt may have been using methamphetamine, but that she allowed paternal aunt to continue caring for Cynthia "[d]ue to observing and looking at all the facts that we can see." Detective Brandon Farrell, the investigating officer, later testified that when he interviewed Mother at the hospital, her appearance was disheveled, with messy hair, "pock or sore marks on her face, visible bruises on her body," and she was speaking with "jittery speech."

3

When asked whether Mother exhibited "signs" of a person high on methamphetamine, Farrell agreed and stated that he believed "there's a possibility that [Mother] was high on methamphetamine the day at the hospital." Farrell testified that Mother identified paternal aunt as the reason for Cynthia's positive drug test and that Mother stated she "does not smoke meth and only admitted to smoking marijuana while being pregnant and breast feeding." Mother did tell Farrell that Father had admitted to her that he had smoked meth "approximately two months before . . . as a celebration of getting off probation."

Arlene Castro, the Department investigator, testified that the Department received a referral about Cynthia the same day and she interviewed Mother that day at the hospital. Castro testified that Mother did not have an explanation for why Cynthia tested positive for methamphetamine but that Mother expressed concerns that paternal aunt and another extended family member were using or had a history of methamphetamine use.[3] Castro testified that the Department sought emergency removal based on the "current situation" and the "family's prior history with illegal substances." Castro testified that the Department found "reason to believe" for neglectful supervision and physical abuse of Cynthia by both parents, although she later clarified that the positive drug test was "enough" evidence to support the physical abuse finding. Castro testified that she met with Father in-person the following day and told Father he needed to complete drug testing and services to have his children returned. Castro testified that the twins were also drug tested and had negative test results.

Both Mother and Father were drug tested on January 13, 2022, and both parents' drug tests were positive for methamphetamine. Mother confirmed she had "occasionally" or

---

[3] Castro later testified that the Department was unable to determine the allegations against paternal aunt because she refused to take a drug test.

4

"periodically" used methamphetamine "while I was off doing Lyft rides," but she later clarified that she used only about "once every four days" for two months, at a "different location" outside the home, and she had "cleaned [herself] up" over several weeks away from the children prior to the removal. Mother also confirmed she subsequently used methamphetamine "once like in February and once in the March area to go into the rehab," explaining that the rehab facility told her that she had "to test positive when coming in or they would not be able to keep me." She confirmed that those instances of methamphetamine usage occurred while she was pregnant with Emmitt. Mother stated she stopped using methamphetamine after March 2022, although Father believed she was still using during portions of the case because "everybody swore I was using."

She testified that she initially had supervised visits during the case, but those visits were suspended in June 2022 because she took a mouth swab drug test at a visit and the Department told her that the test results were positive for methamphetamine and "[e]verything except for THC, if I'm not mistaken." Amanda Swafford, the Department caseworker, later testified that the Department does not typically use oral swab testing because they prefer "lab verified" tests but such tests are used when "we believe the parent is actively under the influence and it's a safety concern."

Mother testified that she left her first rehab facility after three days and that she was aware it would be considered an unsuccessful discharge. Mother confirmed that she tested positive for methamphetamine on another hair follicle test in September 2022. Mother testified that she re-entered rehab in October 2022 but that she "personally did not want to go in" because she said she was not using methamphetamine. She testified that she had been "successfully discharged" after she completed 45 days of the 90-day inpatient rehab program, but later explained that she left early because she was trying to avoid other people who had vapes because

5

tobacco products were prohibited. Mother testified that she took mood stabilizer medication during this inpatient program but she stopped taking "some" of the medication after she left and was no longer taking any medication at the time of the trial.

Two months after leaving the second inpatient rehab program, Mother testified that she started an intensive outpatient program. Mother testified that she completed the intensive outpatient program and was now in the "aftercare" program, which Mother explained was "basically the same as intensive outpatient except" fewer weekly meetings. Regarding medication, she testified that she attended a mental health assessment early in the case but was not prescribed any medication and that "[t]here's not much they were able to do" because Mother already had a therapist. She testified she was committed to staying sober. Mother confirmed that she does not currently have a sponsor, that the Department has "persist[ed] on me getting" one, and that a sponsor acts as a "safety net" if she relapses. She acknowledged she had made mistakes, and she explained that she is looking for a faith-based recovery program close to her. Mother also testified that she had been seeing a counselor since the previous year and that things were "going pretty well" with her marriage counseling with Father.

Mother testified that she had been visiting the children once a week but recently visits went to twice a week. She stated she had taken a protective parenting course and almost finished her nurturing parenting course. Mother also testified that she and Father have a parenting coach who attends some visits and provides information to improve their parenting, and that she was taking comments and suggestions from the parenting coach to work through with her therapist. When asked whether she agreed with many of the parenting coach's suggestions, Mother responded: "Not the way she wanted me to do them." Mother also admitted that there have been problems with the parenting coach and that the parenting coach has said that

6

Mother and Father were not listening to her. Father later testified that he did not "really believe in some of" the parenting coach's "styles," but that he took her suggestions. Father admitted that there was "a couple of times that I definitely did not" do what the parenting coach asked him to do.

In describing an incident at the parents' May 30th supervised visit, Mother testified that she had "[d]isagreements" with Father in front of the children where they raised their voices but they did not "curse." Mother testified that her children did not appear afraid or scared during the disagreement and did not cry. Mother denied that Father "lunged" at her during the argument, instead testifying that Father was getting up from the ground and reaching for Emmitt as Mother was handing Emmitt to him. Father similarly disputed that the argument became "heated" or that any curse words were said, although Father conceded that their voices raised "[s]lightly." Mother confirmed that the parents had two unsupervised visits with the children prior to the May supervised visit, but after that argument, the parenting coach raised concerns to the Department and the unsupervised visits ended. Mother testified, however, that she believed the children would be safe if returned to her and Father and that she is committed to staying in her marriage and relationship with Father.

Mother testified that she initially lived on paternal grandmother's property, that she was evicted by grandmother during the case, but that she was once again living at paternal grandmother's home. Mother testified that the home was safe and appropriate for the children, that the parents had a support network, and that she was currently employed. She testified that she and Father had some marital problems during the case, but that she began living with Father again after Emmitt was born. She later explained that Father had believed she was using drugs, that she had used Father's credit card without his knowledge, and that Father had expressed

concerns about her going on a week-long trip to Florida for a concert, during which visits with her children had to be rescheduled. Mother confirmed that Father worked "odd" jobs for his mother and others. She testified that having the children returned was in their best interest because the parents have "done a lot" and are "ready for them to come home."[4]

Father, who was approximately 47 years old at trial, testified that he was "working on my eighth" child, and that along with his children with Mother he had three adult children. When asked about his drug use history, he testified that he had used methamphetamine for "maybe a year and a half" as a teenager before he "moved on to other things," which he described as "[m]ainly marijuana" and cocaine "[s]poradically through my childhood." He testified that he had not used methamphetamine since May 2010. Father confirmed he had a "lengthy" criminal history, which included a series of drug-related arrests from before 2005. He testified that he also had three DWI convictions and was on probation for ten years following his third DWI conviction in 2010. Father admitted that he drank "[o]ccasionally" during that probation period, which constituted a violation of the terms of his probation.

Father testified that he participated in several different rehab programs and a behavior modification program as part of his previous criminal cases. When asked whether he had a problem or abused drugs and alcohol, Father denied any drug or alcohol problem and said, "I had more of a problem of following the rules." He admitted that in a prior 2020 Department case, there were concerns he was using methamphetamine and that a hair strand drug test during

---

[4] Mother also testified that she had lived with Intervenors for portions of her own childhood, that Intervenors had helped raise her and her brother, and that they had "done pretty good" taking care of the children during the past eighteen months. Mother felt the kids were safe with Intervenors, and she explained that Intervenors were her "first instinct" for temporarily placing the children because "I know they don't have any CPS history and I was comfortable with leaving [the children] with them."

8

that case was positive for methamphetamine, but Father blamed the result on taking Sudafed because "the main ingredient in it is ephedrine and pseudoephedrine which turns out to be the main ingredient in manufacturing methamphetamine." He confirmed that the prior Department case was closed in 2021.

When discussing the present Department case, Father stated he "had no idea" who was responsible for Cynthia testing positive for methamphetamine. Father testified that at the time he had suspicions that Mother was using methamphetamine based on "[o]thers in my community claiming they had seen her doing it" and that he and Mother had separated for part of the case because of those suspicions. Father confirmed that he had a positive drug test result for methamphetamine, but he did not believe the testing was accurate. Father also confirmed that he had used cocaine once "intentionally" to disprove the drug test result that was positive for methamphetamine. (Mother separately testified that Father had told her he had used cocaine and that she had told the Department "at one point" that Father had used it deliberately to show the drug tests were inaccurate.) As Father later explained, he believed the positive test results for methamphetamine were not "accurate" because of his Sudafed use, and Father testified that he stopped using Sudafed when they were ordered to take the drug tests in January after Cynthia's hospital visit. When asked whether he agreed that his later May 2022 drug test result that was positive for methamphetamine would not have been caused by Sudafed if he stopped taking it in January, Father responded: "I don't believe there was a positive test." In later cross-examination, Father confirmed that he had two drug tests taken on April 13, 2021 (i.e., during the previous Department case) and on May 5, 2022, that showed positive test results for methamphetamine.

9

Father testified that he initially had visits supervised by Intervenors, but those visits were transferred back to the Department's office because of concerns about his alcohol use. Father testified that after one visit supervised by Intervenors, Father had grabbed a beer and "got into the passenger side seat" of the parents' truck to head home. When asked whether his service plan required him not to drink, Father testified that his plan only started requiring him not to drink "after that visit"; when pressed whether past conversations with Amanda Swafford, the Department caseworker, meant he "knew that [not drinking] was something [he] needed to do," Father responded "No, I don't." Father confirmed that he had described himself as an "irresponsible drinker in my youth" but that he did not believe he was an alcoholic.

Father then confirmed that he has had multiple positive tests for alcohol during the present case. When asked why he continued to drink, Father responded that "it's my legal right to be able to so as long as I'm going to do it safely and correctly." Father denied his drinking "at that time" violated any court order. However, Father later admitted that he chose to continue drinking after the Department's recommendation that he not drink became part of a court order. Father testified that he decided to stop drinking during the case "[p]artially to prove a point" that he did not "actually have a problem with drinking." When asked whether he plans on drinking in the future, Father demurred that it "depends on the legal system," but he disputed the contention that he had said at a prior hearing that he would continue drinking.

Father confirmed that during the case he had been unsuccessfully discharged by two therapists, discharged from an inpatient treatment facility, and had been unsuccessfully discharged from a protective parenting course. When asked about his slow start, Father explained that he "wasn't getting along with the service providers [or the Department] very well." Father testified that he then underwent intensive outpatient treatment for alcohol use, that

he told the counselor there that he did not have a problem with alcohol, and that he still continued to "occasionally" drink after completing the outpatient treatment. When asked whether "at some level" he understood the importance of not drinking during the case, Father responded: "Actually, I don't."

During later testimony, Father confirmed that he later had two tests that were positive for alcohol on September 28 and December 28, 2022, but he explained that he did not have any positive tests in 2023. As Father explained, he did not drink before any of his visits and was not drinking on a regular basis. Father explained that he began drinking after the first court hearing because of an alleged comment by the guardian ad litem at the hearing. On cross-examination, Father later agreed that he continued to drink until a few months before trial but again stated that he did not have a problem with alcohol.

Father testified that he has participated in individual therapy and that he and Mother have worked on their communication skills in marriage counseling. Father testified that earlier in the case he had concerns about Mother's "level of commitment on getting the kids back" and that Mother had lied to him about using his credit card, but when discussing what had changed in the last few months, Father explained that "[a] lot of this is our communication skills." He testified he has a safe and appropriate vehicle, that he is "committed" to continuing services for his children, and that he has a support system. Father testified he had a job with the electric company until a few weeks before the hearing, but denied he had been fired, instead explaining he had quit because "somebody's got to stay with" the children. Father also testified that he worked for his mother at times. Father testified that the children listen better, follow directions better, and are easier to control and manage when the visits with their parents do not occur at the Department's offices. He expressed that he was committed to sobriety now the same

11

as "13 years ago when I changed my life for my [now adult] kids," and that he would continue working services in the related Department case for Emmitt.

After Father finished testifying, three different witnesses testified regarding the drug-testing procedure and the reliability of the tests. Kenneth Reine, the lab manager at the drug-testing laboratory, explained that after a positive result occurs, the sample is tested a second time to confirm "that we're only reporting on the drug that is present and not some other potential compound that could cause a false positive screen." Reine described the different forms of methamphetamine, and he confirmed that Father's April 2021 and May 2022 drug test results were "predominately" positive for the form of methamphetamine "mostly used illicitly" because of its "strong central nervous stimulation effect," rather than the form more commonly associated with the "decongestant type." Reine later clarified that both of Father's positive methamphetamine results were "well above the cut-off" for testing the presence of methamphetamine. Reine also clarified that it would be "very incorrect" to say a positive result was returned because the person was using Sudafed because the drug testing methods "can differentiate" from the over-the-counter medication so they "do not interfere with the identification of methamphetamine." Janelle Jaworski, the medical review officer who reviewed the parents' drug test results, similarly disputed that a person taking Sudafed or another antihistamine would have a positive test result for the illicit form of methamphetamine, explaining that "the human body cannot convert Sudafed or other over the counter products into" the illicit form of methamphetamine. Susan Mills, the laboratory director for the drug-testing company, similarly confirmed Father's September and December 2022 drug test results that were positive for ethyl glucuronide and ethyl sulfate.

12

Reine also testified that Mother's September 16, 2022 test result also was predominately the same illicit type of methamphetamine and that her December 16, 2022 test results were positive for oxymorphone, "which is a metabolite of oxycodone." Discussing that drug test, Mother had earlier explained that she had been prescribed narcotic medication when she had Emmitt and that she had been prescribed Tylenol 3 for dental work in December 2022. Jaworski later testified that "Tylenol 3 has codeine in it" and that when "codeine in the body breaks down or metabolizes it creates morphine," which would "explain morphine also but not oxymorphone." Jaworski explained that "anything containing oxycodone, OxyContin, Percocet could also cause oxymorphone to show."

Melissa Seibert then testified as an expert witness about the parents' psychological evaluations. She testified that during the evaluation, Father "voluntarily told" her that he had been drinking the day before the evaluation, and that he had used methamphetamine "about four months before he saw me and he used it once" and that Father had regularly used methamphetamine and cocaine in the past. Seibert testified that Father also told her that Mother "had a history of draining the bank account, his mother's bank account and taking a loan out in his name." She testified that Father's primary diagnosis "was antisocial personality disorder with narcissistic features," which she described as involving the "disregard for the rights of others" and "risk taking, financial irresponsibility, possible physical aggression and a lack of remorse for any wrongdoing." Father was also diagnosed with cannabis use disorder, stimulant use disorder, severe and sustained remission of cocaine use disorder, and severe alcohol use disorder. Seibert recommended individual therapy, inpatient rehab, random drug and alcohol tests, parenting classes and coaching, couple's therapy, and attending NA or AA meetings.

Seibert described Mother as having the "classic physical appearance of a meth user." Seibert testified that Mother told her she used marijuana regularly and had used marijuana the day before the evaluation; Mother also admitted to using methamphetamine "prior to having her children and then for a week or so between having her children." Seibert testified that Mother told her that she had last used meth around October 2021. Mother also stated that Father had picked up drinking again. Seibert diagnosed Mother with bipolar disorder with "most recent episode depressed," borderline personality disorder, traumatic stress disorder, and stimulant use disorder. Seibert testified that typically medication was prescribed for treating a bipolar diagnosis, and that going without treatment "can be viewed as dangerous or potentially dangerous diagnosis for yourself and for other people," including children.[5]

Jill Rodriguez, the CASA volunteer, testified that she was appointed around February 2022. She supervised a parental visit at the Department office in January 2023, and she described it as "very busy, chaotic" and that what she "observed was very little control from the parents being able to re-direct, being able to manage all four children." She later explained that during the visit, the twin boys were stuffing toilet paper down the toilet while Mother changed Cynthia's diaper. Rodriguez also described that the children were coloring on the walls, that Mother was "giving the children anything they wanted," and that the parents had not taken steps to change or feed Emmitt, who had been "crying for quite a while" toward the end of the visit. When asked whether Father helped, Rodriguez responded that "yes, at times" and described him as helping with "one child at a time." When asked to describe what she observed when visiting

---

[5] After Seibert testified, Intervenor great uncle testified about how Intervenors had cared for the children during the course of the proceeding, their intention to allow Mother and Father to remain part of the children's lives if Intervenors were awarded managing conservatorship, and the support system in place to help with the children.

the Intervenors, she described that the children are "very bonded" with Intervenors, that the children respond when redirected by Intervenors, and that the Intervenors are "very calm with them." Rodriguez testified that when she observed the children leaving their supervised visits with parents and returning to the Intervenors, Rodriguez saw "there was a definite change in the mood" of the children and "[t]here was a calming" when the Intervenors arrived.

Rodriguez testified that Father was "not wanting to accept any responsibility and very slow to get started on working his services" but that both parents had made some recent progress. As an example, she described how the parents had made improvements to their home after she observed safety concerns during her initial visit. When asked whether Father has acknowledged his substance abuse issues during the case, Rodriguez responded in the negative, explaining that Father continued to deny any issue and she was "very concerned about long-term sobriety without consistent participation in NA or AA." She later testified that she was not aware of Father having a sponsor and that Father had not provided any proof of attendance at any AA or NA meeting. She testified that Father has never admitted to methamphetamine use during the case and "has always stated that it was the Sudafed that caused the positive" result. She also testified that Mother has not taken responsibility for what happened to Cynthia. Rodriguez expressed concern about the lack of a sponsor for Mother and that "[t]here hasn't been enough sobriety within the case to feel like long-term [sobriety] is a possibility at this point."

Rodriguez expressed concerns regarding Father's decision-making during the case, including that he "continued to drink alcohol even though it was part of his service plan not to" and that he "testified that he took cocaine in order to prove a point with a drug test." She similarly expressed concern about Mother's decision-making, including the multiple positive drug tests, leaving multiple rehab programs, and failure to take responsibility. When asked

15

whether a person has to use drugs to be admitted into rehab, Rodriguez responded "No" and that "[t]he most concerning part of that is that [Mother] was pregnant" with Emmitt at the time. While she agreed that the parents had been sober for approximately six months before trial, Rodriguez cautioned that with their history that was not a sufficient period to show they would remain sober. She noted that the parents have missed numerous appointments with service providers in the case and that Mother has missed numerous drug tests. She again later expressed concerned about the parents' history of drug use and their arguments in front of the children, stating that the parents' relationship had "at times volatile tendencies" and that she felt the parents were "not on the same page" after observing multiple arguments. When asked about whether the parents just had a different approach from that suggested by the parenting coach, Rodriguez explained that the parenting coach "was brought in for a reason" and that the parents are "choosing not to engage with her." Rodriguez recommended that Intervenors be appointed managing conservators because they "are a safe and stable environment and I do not view the parents as a safe and stable environment at this time." She further said that it would be a danger to the children to return them to the parents but the parents should have contact with the children "[i]f they remain sober."

Brittany Herzog, the parenting coach, testified that she had "around eight" sessions with the parents, starting in February 2023. She stated that the parents told her they had difficulty managing all four children but that the parents "didn't think that they really had any difficulty other than managing and that the reason that they were doing [the parenting coaching] was just because the judge ordered it." Herzog testified that she observed the parents having difficulty managing the children, explaining that "the children were physically violent with each other," that "it was chaos and very disorganized," and that it "was not a smooth or manageable

16

situation for them." She testified that the "parents have maintained" that "they don't believe it's their parenting," but rather blamed the size of the room, the structure, and their limited time with the children.

Herzog testified that she was not "able to communicate with the parents at all" and discussed how Mother would "just continue speaking to the children" while Herzog was speaking and would "often times turn[] her back to me and not answer[] me or mak[e] any kind of eye contact." Herzog testified that Father was also confrontational "two or three times" and had "raised his tone" towards her "several times." When later asked whether Father may just be "loud" rather than raising his tone with her, Herzog responded that "there's a difference between speaking harshly to someone and just being a loud kind of jolly person." She testified that after approximately five visits of being unable to orally communicate, she "turned to e-mail" because the parents otherwise "refused to even communicate with me or even answer me." Herzog testified that she does not believe the children view their parents as authority figures. She explained that the parents often responded to her suggestions by saying they did not want to make their children cry or upset them, and she later discussed an example of Chris repeatedly hitting Mother with a pull-up diaper during a visit, but when Herzog suggested that Mother warn him that she would take away the pull-up diaper, Mother only repeated saying "stop" but did not remove the pull-up diaper from his possession. Herzog testified that this was a safety concern because Mother had another child on her lap and was "unwilling to stop the child from hitting." Herzog testified that the parents had one or two visits that made Herzog "feel really positive," but then the parents "just completely regressed and went right back" at the May 30 visit.

She explained that at the May visit, Cynthia "was seeking attention more than usual," and that Chris was being "more aggressive," including hitting with the pull-up diaper.

After Mother returned from taking all four children to the bathroom against Herzog's recommendation, Herzog testified that the parents had a "heated argument" with swearing by Mother, and Father lunged towards Mother when she sought to hand him a child. Herzog testified that "it wasn't the motion, but it was the feeling." She also expressed concern that Father was unable to control his "big feeling in that moment knowing he was being observed" and she did not know how it would have escalated if "it had not been observed and videotaped." Herzog testified that the argument lasted five to six minutes and she disputed that Father's lunge was only "reaching for the baby." She later clarified that she was in the observation room during the argument and was unable to hear what the argument was specifically about. Herzog testified that a Department representative also had to intervene at another point during the visit to address one of the children who was throwing a tantrum in the public waiting room. In summarizing the May 30 visit, Herzog testified that the visit was the most chaotic, that Mother had some improvement with "stand[ing] her ground" with the twins but "did ultimately give in and give them their way," and that "in every other way I felt it went backwards and regressed."

Herzog agreed that there is "a certain amount of chaos" when a person has a "bunch of little kids," but she expressed concern about the "chaos level" here "when you're in a controlled environment with these children in a small room" without dangerous objects and the parents "can't even [manage the children] in that setting." As Herzog explained, "I need to be able to see [the children] safely managed in a small environment before I could even imagine what they would be like in a home environment." She also expressed concern about the parents' unwillingness "to take professional advice" relating to their children. When asked about whether the parents improved or took any of her suggestions, Herzog testified that Mother had some improvement but would still "give in" to the twins "more than I wished." When asked whether

18

the parents were "listening" to her, Herzog testified that the progress only began after she switched to e-mailing the parents and "zero progress was made when I was personally visiting and trying to talk to them." Herzog conceded that letting a child "cry those tantrums out" was a parenting technique, but she explained she did not recommend that technique because "it gives control to the child not the parent. And I needed to see the parents taking control." When asked how the parents could be seen as authority figures when they only see their children for a limited amount of time, Herzog explained that "it's about consistency" and compared it to rules set by grandparents who only see their grandchildren "once or twice a month."

Herzog testified that she never saw chaos such as in the visitation room in her own Montessori classroom when she taught 26 to 30 children. She also testified that she had successfully taught other parents with three to four children how to manage their children, and she explained that parents are usually "really willing to take my advice." Here, Herzog testified that she did not feel that the parents were willing to follow her suggestions and she did not believe that they had the skills to manage the children. She summarized that the parents had "made very small progress" but not enough progress to manage their children, and she recommended that more parent coaching would be beneficial if the parents were willing to listen to suggestions.

Amanda Swafford, the Department caseworker, then testified that at her initial meeting with the parents in this case, she informed them that both had tested positive for methamphetamine. Swafford testified that Father denied using and said his results were due to Sudafed; Mother initially denied the methamphetamine use but admitted to it "a couple of months into the case." Swafford testified that at the family group conference at the beginning of the case, they "went over" the service plan that included that Father would not drink alcohol.

19

She testified that at the time the parents were having visits supervised by Intervenors, but that stopped after the meeting where Intervenors were "concerned with [Father] drinking after a visit." In describing the service plan, Swafford explained it required, among other things, the parents to complete a psychological assessment and follow recommendations, engage in individual therapy, submit to random drug and alcohol tests, refrain from using any illegal substances, alcohol, or prescriptions not prescribed to them.

Swafford testified that the parents had a "slow start" working services, explaining that "it was a hard hurdle to get over with blaming others for the situation." She confirmed that Mother first went to an inpatient rehab program, that Mother reported she intentionally used methamphetamine "knowing she was pregnant so she could be admitted," that Mother did not have to use drugs to be admitted into rehab because a spot was already secured, and that Mother left that facility after three days. Swafford explained that Mother then began a 90-day inpatient treatment program in October 2022, but that Mother left on the 46th day. Swafford testified that Mother tested positive for oxymorphone in a December 2022 test; she stated that Mother explained she had "dental work done" but Swafford reviewed the dental records and additional medication information Mother provided and none of the drugs in those records "would make her test positive for" oxymorphone. Along with her positive tests, Swafford testified that Mother also missed a total of 17 drug tests during the case. Swafford explained that Mother completed an intensive outpatient program around the beginning of May 2023, that Mother was currently enrolled in an aftercare program, and that Mother is "close to the end" of the aftercare term. Swafford cautioned, however, that Mother "needed a higher level of care that she did not complete or receive."

She testified that there were concerns about Mother's mental health from the very first meeting in the case because of Mother's "self-disclosed mental health history" but that "it was very hard to get her to engage in mental health services" and that she only started to get "back on track" once she had Emmitt. Swafford testified that Mother also told her she was working with her primary care physician, that Mother was recommended for psychiatric care, and that Mother "did not follow through." Regarding outstanding services, Swafford testified that Mother was in "partial compliance," but had not completed several services or been discharged from individual or couples' therapy. Swafford also explained that Mother began a protective parenting course in January 2023 (roughly 13 months into the case) and completed the classroom portion in April, but she failed to turn in her final essay until the week of the trial, two months later; Swafford explained that "due to it being late it was not accepted." When asked whether Mother was managing her mental health issues, Swafford later testified that Mother is in therapy but that she is not taking any medication or seeing a psychiatrist.

Swafford testified that Father was unsuccessfully discharged from his first two therapists and that Father was still engaged in therapy with his third therapist at the time of trial. She testified that in May 2022 Father was unsuccessfully discharged from an inpatient rehab facility after a week. Swafford testified that Father was recommended an inpatient treatment program, but that he instead began an intensive outpatient program in July 2022. Father completed the outpatient program, and he received recommendations to engage in AA, obtain a sponsor, and not drink alcohol after completing the program. Swafford testified that Father, however, continued to drink alcohol. In describing Father's positive test results for alcohol, Swafford testified that there was "at least one and sometimes two a month" of positive tests "up until December of 2022." She spoke about Father's continued drinking in violation of a court

21

order and stated that Father told her that "he is over the age of 21 and that no one can stop him from drinking" because it is "his right." Swafford explained that "it was part of his family plan and that was a court order," but she said Father responded that "the only people he would listen to would be the police or if he was on probation."[6]

Swafford then testified that the Department saw "some progress" from the parents "in the last five months" of the 18-month-long proceeding. But she cautioned that neither parent admitted responsibility for the children being in the care of the Department. She also described her observations of parental visits in December 2022 and February 2023, explaining that the parents were engaging with the children but that Intervenors were "doing the parenting" and taking charge if the children "became upset" or "fussy." Swafford testified that the parents' visits with the children had "[s]lightly" improved but the parents "still have a hard time providing supervision for all the children." When asked why unsupervised visits were stopped after Herzog raised concerns, Swafford explained that "if that is what happened in a supervised setting in a controlled space, what would happen in a public space where it wasn't a controlled setting." Swafford agreed that nothing negative had been reported from the parents' unsupervised visit, but later clarified that concerns about how the parents acted during an unsupervised visit would have had to come from the parents themselves because those visits were unsupervised. Given the "observed concerns during th[e] supervised time," the Department

_____

[6] Multiple witnesses also testified regarding one of Father's drug tests from the week before trial. Swafford testified that results of that urine test did not alleviate the Department's concerns about Father's long-term sobriety. Father had previously testified that he had been prescribed antibiotics and Tylenol 3, which listed both acetaminophen and codeine on its packaging, for an ear infection. Swafford then later testified that Father provided a prescription that was dated after the testing date, and then provided an older prescription in January 2023 for treating a toothache that Father told her he took five months later for his earache. Swafford confirmed Father provided proof of the older prescription, but responded that "it wasn't prescribed for an earache."

felt it would not be safe for there to be no supervision and requested that additional visits be supervised.

Swafford testified that the best interest of the children was that Intervenors be named primary conservators, that the parents have possessory appointments so that parents are "still able to visit the children and attend events as long as it's done in a safe way." Swafford noted that when the children were previously left in the parents' care after the close of the last Department case, Cynthia ended up testing "positive for amphetamines and was hospitalized." Swafford later summarized that her concerns were about the parents' ability to manage the children and keep them safe, Mother's mental health, and Father's continual denial of his methamphetamine use and alcohol use problem. She also expressed concerns about whether Mother or Father would maintain sobriety. Swafford testified that Father is abstaining from alcohol "to prove a point, but I believe that he would immediately go back to those behaviors." She also referenced Mother's "long history of meth use," cautioned that she is only five months sober, and expressed concern about Mother leaving her rehab program early. As Swafford summarized, it is difficult to "achieve reunification if you can't admit to the problems that brought the children into care."

Curtis Laurence, the parents' marriage counselor, testified that he had worked with the couple for three months, starting in March 2023. Laurence testified that the parents were willing and engaged from the start and wanted to work on conflict resolution skills and to build their trust and connection. He testified that the parents have learned how to recognize when a conversation "is not going well" and "being able to kind of step back and change what you're saying or how you're coming across." Laurence explained that he did not anticipate many more sessions before the parents would be "ready to close out." When asked whether the

23

parents discussed what happened at the May supervised visit, Laurence testified that the parents told him that they had an argument that involved "cussing." Laurence testified that the parents were able to work through that issue and "talk it out in a session." When asked whether he had any concerns about Mother's psychiatric needs, Laurence testified that "[n]ot from what I've experience[d] from her in the sessions," but he later clarified that he was not asked to assess Mother's mental health needs in this case.

On cross-examination, Laurence testified that the couple needed to rebuild trust because of substance abuse and its effect on their relationship. Laurence testified that Father thought he had a substance abuse problem with alcohol. Laurence admitted that he was "focusing" on the parents' relationship and that he had not seen them with their children. Laurence testified that they discussed the credit card issue, that Mother "shut down" regarding that issue, and that issue "goes back to trust." Laurence agreed that the parents were still having concerns and issues regarding trust in April sessions and were still having conflicts about different parenting styles during the month before the trial.

Paternal grandmother testified that the parents live in her home and that Father helps "takes care of my property" and some rental property. She testified that her relationship with Mother had previously been problematic because paternal grandmother said she had been fed "a lot of misinformation" about Mother "doing drugs." Paternal grandmother testified that she had evicted Mother after the parents separated but that she allowed Mother to return after she had Emmitt and the parents were both "clean of drugs." Paternal grandmother testified that Mother has "done 180 degree turn" from the previous year. Paternal grandmother testified she can recognize when the parents are under the influence, and she does not believe they have been under the influence recently. She also testified that she has not seen Father "inebriated in about

24

14 years." After being asked about the parents' positive drug and alcohol tests, paternal grandmother testified that she "never saw [Mother] take any drugs and I did not see [Father] take any alcohol while the children were in his possession." When discussing Father's plans to have the children returned, paternal grandmother mentioned that Father was "going to stop his beer a night and get himself on a deal." Paternal grandmother also admitted she had "heard" that Father had also tested positive for methamphetamine, and she stated she had "no idea" Mother missed seventeen drug tests.

Joseph Mcadoo then testified that he had worked with Father on a variety of "side work" and that there was a job opening at Mcadoo's company for Father. Mcadoo explained his understanding that Father and Mother are clean now but that "[a] year and a half ago, I would say at that point yes" the parents were using. Mcadoo testified that the parents "look healthier" and "there's been a big change in the way they look, their appearance, they're getting better, thinking straighter." On cross-examination, Mcadoo conceded that he had heard from others that parents were using drugs but that he did not witness it himself.

At the end of the trial, the jury returned a verdict appointing Intervenors as managing conservators and Mother and Father as possessory conservators. The trial court thereafter entered a final order consistent with the jury's verdict, finding that appointing the parents as managing conservators would significantly impair the children's physical health or emotional development.[7] Mother and Father filed notices of appeal, challenging the legal and factual sufficiency of the evidence supporting the jury's finding and the trial court's judgment appointing Intervenors as managing conservators and the parents as possessory conservators.

---

[7] That final order also provided that the parents would have supervised possession and access to the children pursuant to the specific terms contained in the order, rather than a standard possession order.

25

# STANDARD OF REVIEW

In this case, the jury determined the mandatory and possessory conservators of the children. *See* Tex. Fam. Code § 105.002(1) (authorizing party to demand jury trial and prohibiting trial court from contravening jury verdict on specified issues, including appointment of managing and possessory conservators); *see also Y.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00705-CV, 2020 WL 1057731, at *3 (Tex. App.—Austin Mar. 5, 2020, no pet.) (mem. op.). "Evidence is legally sufficient when it would enable reasonable and fair-minded people to reach the verdict under review and is factually insufficient only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.); *see also Y.S.*, 2020 WL 1057731, at *3.

Conservatorship determinations are intensely fact driven, and therefore the factfinder is "best position[ed] to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)) (cleaned up). Thus, "[i]f reasonable people could differ in their conclusions, we will not substitute our judgment for the jury's, and we must defer to the jury's reasonable determinations of the credibility of the witnesses, the weight to be given to their testimony, and the resolution of evidentiary conflicts." *Y.S.*, 2020 WL 1057731, at *4. So long as there is "some substantive, probative evidence to support its decision," *see A.S.*, 665 S.W.3d at 795, we cannot sustain a sufficiency challenge to the jury's determination of conservatorship, *see Y.S.*, 2020 WL 1057731, at *3.

26

## APPLICABLE LAW

In their shared issues on appeal, Mother and Father argue that there was legally and factually insufficient evidence supporting the appointment of Intervenors as managing conservators. The best interest of the child is always the "primary consideration" of conservatorship decisions. Tex. Fam. Code § 153.002. There thus is a rebuttable presumption that appointment of a parent as a managing conservator "is in the best interest of the child." *Id.* § 153.131(b). "The presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law," *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990), and the fact that another party, such as Intervenors, "would be a better custodian of a child is not sufficient to rebut the parental presumption absent" additional required showings, *id.* (quoting 89–1 State Bar Section Report—Family Law 27 (J. Sampson ed. 1989)).

The Family Code therefore requires that a parent be appointed managing conservator unless the factfinder determines that the appointment "would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code § 153.131(a). The nonparent has the burden to rebut the parental presumption by a preponderance of the evidence. *A.S.*, 665 S.W.3d at 796; *see also* Tex. Fam. Code § 105.005 (requiring that findings generally be based on preponderance of evidence). Generally, evidence of a parent's specific acts or omissions "that demonstrate an award of custody to the parent would result in physical or emotional harm to the child" is sufficient proof to rebut the parental presumption. *A.S.*, 665 S.W.3d at 796 (quoting *Lewelling*, 796 S.W.2d at 167); *see also J.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00162-CV, 2021 WL 2834719, at *4 (Tex. App.—Austin July 8, 2021, no pet.) (mem. op.). The evidence, however, must go beyond raising the "mere potential threat" of harm, *In re B.B.M.*,

27

291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied), or the "mere suspicion or speculation of possible harm," *J.H.*, 2021 WL 2834719, at *4. Parental conduct that constitutes significant impairment includes, but is not limited to, physical abuse, severe neglect, drug or alcohol abuse, abandonment, bad judgment, history of mental disorders, or "immoral behavior by the parent." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.); *see also V.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00117-CV, 2023 WL 6632911, at *5 (Tex. App.—Austin Oct. 12, 2023, no pet. h.). Furthermore, the "material time to consider is the present." *In re S.T.*, 508 S.W.3d at 492. Although "a factfinder may infer the present unfitness of the parent to be managing conservator from the parent's recent, deliberate past misconduct," *C.O. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00453-CV, 2022 WL 413374, at *4 (Tex. App.—Austin Feb. 11, 2022, no pet.) (mem. op.), evidence of past conduct alone "may not, by itself, be sufficient to show present unfitness," *A.S.*, 665 S.W.3d at 797 (quoting *In re S.T.*, 508 S.W.3d at 492). With these standards in mind, we turn to the parents' challenges to the conservatorship determination.

**DISCUSSION**

Mother and Father raise two similar issues on appeal. First, the parents argue that there was "no evidence" offered at trial to overcome the applicable presumptions because the Intervenors did not put on evidence. Second, the parents argue that insufficient evidence supported the jury's finding that appointing Mother or Father as managing conservators would significantly impair the children's physical health or emotional development.

28

*Evidence Supporting Conservatorship Determination*

In their first issues, Mother and Father argue that the parental presumption under Section 153.131(a) cannot be overcome because Intervenors did not introduce any evidence at trial. To overcome the parental presumption, the factfinder must find that "the appointment [of the parents] would significantly impair the child's physical health or emotional development." Tex. Fam. Code § 153.131(a). This statute places the burden on the nonparent "to offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *A.S.*, 665 S.W.3d at 796 (quoting *Lewelling*, 796 S.W.2d at 167). In the proceeding below, the Department filed the original petition, sought to have Intervenors appointed as managing conservators and the parents appointed as possessory conservators, and pursuant to those ends, the Department put on evidence, sought admission of exhibits, and questioned witnesses relevant to the jury's determination as to the parental presumption. *See* Tex. Fam. Code § 153.131(a). Thus, contrary to the parents' assertions, there was evidence introduced at trial relevant to the presumption determination; that evidence was just introduced by the Department, not Intervenors.

Mother and Father rely on the Supreme Court's statement in *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990), that the "statute thus requires the *nonparent* to offer evidence," *id.* (emphasis added), to contend that Intervenors specifically were required to put on evidence at trial to overcome the parental presumption, and therefore there was "insufficient" evidence supporting the jury's determination on that issue. But the Department, as the nonparent seeking affirmative relief in the underlying proceeding, *did* put on evidence at trial going to the parental presumption. Neither Section 153.131 nor *Lewelling* requires that the nonparty who is ultimately appointed managing conservator must have been the specific

nonparty who introduced the relevant evidence at trial, and we decline to read such a requirement into those authorities.

Insofar as Mother and Father read *Lewelling* as requiring multiple nonparent parties to introduce duplicate evidence, they misapprehend the holding in *Lewelling*. There, paternal grandparents intervened in a divorce proceeding initiated by their daughter-in-law, seeking managing conservatorship of their son and daughter-in-law's shared child. At the final hearing, both the paternal grandparents and daughter-in-law put on "a number of witnesses" and other evidence, *Lewelling v. Lewelling*, 774 S.W.2d 801, 802 (Tex. App.—El Paso 1989), *rev'd*, 796 S.W.2d 164 (Tex. 1990), and the trial court concluded that naming daughter-in-law as managing conservator would significantly impair the child's physical health and emotional development, *Lewelling*, 796 S.W.2d at 165. The court of appeals affirmed that decision, but the Supreme Court reversed, explaining that the paternal grandparents put on some evidence but failed to put on evidence specifically identifying any act or omission committed by daughter-in-law that would rebut the parental presumption. *See id.* at 168 (admonishing that paternal grandparents cannot rely on evidence of domestic abuse suffered by daughter-in-law to rebut parental presumption). That is, the issue before the court in *Lewelling* was not about *which* nonparent must satisfy the burden of overcoming the parental presumption, but rather that the only nonparent party failed to introduce any evidence to overcome that burden. The parents have otherwise not cited any authority, nor have we found any, that holds that multiple nonparent parties in a conservatorship proceeding must offer separate, duplicative evidence for a factfinder to determine that the parental presumption has been overcome.

Although Intervenors were nonparent parties who intervened on the eve of trial, they sought identical relief as the Department and the Department did put on evidence relevant to

30

the conservatorship determinations at issue. Accordingly, there was evidence offered by nonparties that goes to the parental presumption under Section 153.131.[8] We therefore overrule the parents' first issues.

***Significant Impairment Finding***

In their second issue, Mother and Father contend that insufficient evidence supported the jury's finding that appointing Mother or Father as managing conservators would significantly impair the children's physical health or emotional development. We disagree.

Although Father testified that he had not used methamphetamine since 2010, evidence at trial established Father had tested positive for methamphetamine in April 2021, January 2022, and May 2022. Father also repeatedly tested positive for alcohol, even though refraining from drugs and alcohol was part of his court-ordered service plan. *See In re S.T.*, 508 S.W.3d at 492 (including drug or alcohol abuse as constituting significant impairment). Mother similarly testified that she stopped using methamphetamine in March 2022 (i.e., after the case had already started), but she also had a positive drug test for methamphetamine the following September, had another drug test in December that was positive for oxymorphone and

---

[8] Mother and Father raise a similar argument regarding the evidence supporting the trial court's determination to modify the standard possession order pursuant to Section 153.193. *See* Tex. Fam. Code § 153.252 (providing that "rebuttable presumption that the standard possession order . . . provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator; and is in the best interest of the child"); *see also id.* § 153.193 ("The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child."). However, their entire argument challenging the possession and access determination by the trial court similarly requests that this court disregard the voluminous evidence in the record because it was introduced by the Department, not Intervenors. We decline that invitation. *See In re J.J.R.S.*, 627 S.W.3d 211, 219 (Tex. 2021) (stating no abuse of discretion in restricting parent's possession or access when record contains "some evidence" supporting best interest finding).

could not be explained by mother's medical records, and failed to test 17 other times, even though testing was part of her court-ordered service plan.

Witnesses did generally testify that Mother and Father had been sober for approximately the final six months before trial, but the jury also heard testimony from Swafford, the Department caseworker, expressing concern about whether either parent would maintain sobriety, and from Rodriguez, the CASA volunteer, that there was not a sufficient time period to show that Mother would remain sober given the parents' history of drug and alcohol abuse. Mother conceded that she did not have a sponsor even though the Department wanted her to have one because a sponsor acts as a "safety net" if she relapses. Evidence at trial further showed that both parents had required multiple attempts to complete drug treatment programs. Swafford testified that neither parent had admitted they had a problem, that Father denied methamphetamine use or a problem with alcohol use, and that Father had admitted to her that he would "go back to drinking, but just you know do it in a responsible way." Rodriguez similarly testified that Father continued to deny any issue, did not have a sponsor or provide any proof of attendance at any AA or NA Meeting, and that Father had maintained that his positive drug test results were caused by Sudafed. Father's psychological evaluation also showed Father was diagnosed with severe alcohol use disorder. Father himself testified that he had stopped drinking during the case "[p]artially to prove a point" but that he did not believe he "actually [had] a problem with drinking," and when asked whether he planned on drinking in the future, he demurred by saying "depends on the legal system." As the CASA volunteer summarized, there remained concerns about both Father's and Mother's decision-making during the case, including their continued positive drug tests, their failure to take responsibility for their circumstances, and Father's taking cocaine to "prove a point" about the drug test's reliability. *See V.M.*,

32

2023 WL 6632911, at \*5 (explaining that bad judgment and "immoral behavior" are additional grounds for significant impairment finding). Although there was evidence the parents made "some" progress near the end of the case, the jury was "best position[ed] to observe the demeanor and personalities of the witnesses" in weighing the conflicting testimony and could have reasonably inferred that Mother and Father had not sufficiently addressed their drug and alcohol problems or their poor decision-making. *See In re J.J.R.S.*, 627 S.W.3d at 218; *Y.S.*, 2020 WL 1057731, at \*4; *cf. In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) (cautioning that factfinder in termination proceedings is "not bound to accept the truth or accuracy of a parent's testimony" about future intentions).

There was also extensive testimony presented to the jury that neither Mother nor Father demonstrated the ability to manage the children and keep them safe while in their care. Herzog, the parenting coach, testified that throughout eight sessions with the parents, she saw "very small progress" in managing the children but that generally the parents had difficulty in managing all four children together, that "the children were physically violent with each other," that "it was chaos and very disorganized," and that it "was not a smooth or manageable situation for them." Herzog testified that the parents ignored her advice during in-person visits to such an extent that she resorted to sending suggestions by email and that the parents were only undertaking the parenting coaching "because they were being ordered to." As the CASA advocate explained, the parents were "choosing not to engage with" Herzog even though the parent coach "was brought in for a reason." Rodriguez and Swafford similarly testified that when they observed the parents during visits, the parents had little control over the children. In contrast, Rodriguez testified that she observed "a definite change in the mood" of the children around the "calming" influence of the Intervenors and that the children listened to the

33

Intervenors. As Herzog explained, the parents' lack of authority over the children was not a difference of parenting opinion, but represented a safety concern, such as when Mother was "unwilling to stop [one child] from hitting" her while she was holding another on her lap.

Moreover, Herzog testified that at a May 30 supervised visit with the children, the parents had a heated argument during which Mother was swearing and Father lunged at Mother in front of the children. Herzog described the visit as chaotic and explained that there was a "feeling in the room" and she was concerned because she did not know how it would have escalated if "it had not been observed and videotaped." Mother and Father both testified that they considered suggestions from Herzog and disputed that the argument at the May 30 visit was heated or that the parents cursed. But the marriage counselor testified that the parents told him that they had an argument that involved "cussing," and Swafford testified that the concerns raised by the parenting coach led to the ending of unsupervised visits by the parents because "if that is what happened in a supervised setting in a controlled space, what would happen in a public space where it wasn't a controlled setting." The jury heard all of that evidence and was best-positioned to resolve the conflicting testimony and draw reasonable determinations that the parents failed to implement changes to their parenting and lacked the skills necessary to manage and control their children to avoid safety concerns. *See Y.S.*, 2020 WL 1057731, at *4.

Finally, the jury heard testimony from Seibert that Mother was diagnosed with bipolar disorder and that psychiatric medication was typically prescribed to treat a bipolar diagnosis because going without treatment "can be viewed as dangerous or potentially dangerous diagnosis for yourself and for other people," including the children. Although Mother testified that she took some medication during her second inpatient treatment program, Mother confirmed she had stopped taking the medication at the time of trial. Swafford further testified that Mother

34

was recommended psychiatric care but "did not follow through," and she expressed concern that Mother was not taking any medication or seeing a psychiatrist as part of managing her mental health issues. Seibert similarly diagnosed Father with severe alcohol use disorder and recommended that he attend NA or AA meetings, but Father continued to deny he had any problem with alcohol, did not have a sponsor or provide proof of attending such meetings, and only responded that it "depends on the legal system" whether he planned on drinking in the future. *In re S.T.*, 508 S.W.3d at 492 (including history of mental disorders as ground for significant impairment).

Taken together, the jury could have credited the above evidence regarding Father's and Mother's actions (and inactions) to find that the Department had rebutted the parental presumption and that appointing Father or Mother as managing conservators would significantly impair the children's physical health or emotional development. *See In re S.T.*, 508 S.W.3d at 492 (stating drug or alcohol abuse, bad judgment, and history of mental disorders constitute significant impairment); *see also V.M.*, 2023 WL 6632911, at *8 (affirming appointment of nonparent conservator). Viewing the evidence under the applicable standards, we conclude that the evidence was legally and factually sufficient to support the jury's determination that appointing Father or Mother as managing conservator would significantly impair the children's physical health or emotional development. *See A.S.*, 665 S.W.3d at 795; *cf. Y.S.*, 2020 WL 1057731, at *5. We overrule Father's and Mother's second issues.

**CONCLUSION**

Having concluded there was legally and factually sufficient evidence supporting the appointment of Intervenors as the children's managing conservator and the parents as possessory conservators, we affirm the trial court's order.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed:   January 11, 2024